**20-15616**

IN THE

# 𝕌nited 𝕊tates 𝕮ourt of 𝕬ppeals

### FOR THE NINTH CIRCUIT

_____

IN RE: GOOGLE INC. STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION

BENJAMIN JOFFE, et al.,
*Plaintiffs-Appellees*,

DAVID C. LOWERY,
*Objector-Appellant*,

—v.—

GOOGLE, INC.,
*Defendant-Appellee.*

_____

On Appeal from the U.S. District Court for the Northern District of California,
Case No. 3:10-cv-2184-CRB
The Honorable Charles R. Breyer

---

### ANSWERING BRIEF OF DEFENDANT-APPELLEE GOOGLE, INC.

---

David H. Kramer
WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation
650 Page Mill Road,
Palo Alto, CA 94304
Tel: (650) 493-9300
Fax: (650) 493-6811
dkramer@wsgr.com

Brian M. Willen
Eli B. Richlin
WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Tel: (212) 999-5800
Fax: (212) 999-5899
bwillen@wsgr.com
erichlin@wsgr.com

*Attorneys for Defendant-Appellee Google, Inc.*

---

*(Additional Counsel Listed on Inside Cover)*

Paul N. Harold
WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation
1700 K Street, NW, Fifth Floor
Washington, D.C., 20006-3817
Tel: (202) 973-8800
Fax: (202) 973-8899
pharold@wsgr.com

*Attorneys for Defendant-Appellee Google, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant-Appellee states that Google LLC (misidentified in the caption as "Google Inc.") is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company, and that no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

/s/ *Brian M. Willen*
Brian M. Willen
*Attorney for Defendant-Appellee*
*Google LLC*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES .................................................................iv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .........................................................3

COUNTERSTATEMENT OF ISSUES FOR REVIEW ...........................4

COUNTERSTATEMENT OF THE CASE ............................................4

    A.    Background on Google Street View and The Payload Collection .......................................................................4

    B.    Investigations By Federal Agencies And State Attorneys General And The Assurance of Voluntary Compliance .................6

    C.    Procedural History.......................................................7

        1.    Google's Motion To Dismiss And Interlocutory Appeal ...............................................................8

        2.    Jurisdictional Discovery On Remand .......................8

        3.    The Class Settlement Agreement.............................11

        4.    Judge Breyer's Approval Of The Settlement Agreement.......................................................14

SUMMARY OF ARGUMENT .......................................................20

ARGUMENT .............................................................................23

I.    *CY PRES* DISTRIBUTION BEST BENEFITS THE CLASS BECAUSE IDENTIFYING AND PAYING INDIVIDUAL CLASS MEMBERS IS NOT FEASIBLE....................................23

A.    *Cy Pres* Relief Is Appropriate Under Rule 23 For Settling Class Actions Like This One ................................................. 24

B.    The Settlement Here Is Non-Distributable Because It Was Not Feasible To Create A Claims Process Replicating The Special Master's Investigation ................................. 29

C.    Self-Certification Is Not An Available Mechanism For Identifying Class Members In This Case ............................................ 32

II.    GOOGLE DID NOT SELECT THE *CY PRES* RECIPIENTS AND HAS NO DISQUALIFYING RELATIONSHIP WITH ANY OF THEM ..................................................................................... 38

A.    Google Had No Role In The Selection of *Cy Pres* Recipients ........................................................................................ 38

B.    Google Had No Disqualifying Relationship With Any Of The *Cy Pres* Recipients ..................................................................... 40

III.    THE SETTLEMENT AGREEMENT PROVIDES MEANINGFUL INJUNCTIVE RELIEF TO THE CLASS ........................ 46

CONCLUSION ...................................................................................... 50

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .................................................................35, 36

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .............................................23, 46, 47, 48, 50

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013).........................................................45

*Frank v. Gaos*,
139 S. Ct. 1041 (2019).............................................................................25, 43

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ....................................................................25, 31

*In re Google Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) ....................................................................18, 24

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
794 F. Supp. 2d 1067 (N.D. Cal. 2011).........................................................8

*In re: Google Referrer Header Privacy Litigation*,
869 F.3d 737 (9th Cir. 2017) ......................................... 24, 25, 31, 43, 44, 45

*In re Pharm. Indus. Average Wholesale Price Litig.*,
588 F.3d 24 (1st Cir. 2009).............................................................................25

*Int'l Bhd. of Teamsters, Local Union No. 1224 v. Allegiant Air, LLC*,
788 F.3d 1080 (9th Cir. 2015) .......................................................................32

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018).....................................................................................27

*Joffe v. Google, Inc.*,
729 F.3d 1262 (9th Cir.), *amended and superseded on reh'g*,
746 F.3d 920 (9th Cir. 2013) ...........................................................................8

iv

*Klier v. Elf Atochem North America, Inc.*,
  658 F.3d 468 (5th Cir. 2011) ........................................................25

*Knox v. SEIU, Local 1000*,
  567 U.S. 298 (2012)................................................................28, 29

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ........... 18, 22, 23, 24, 25, 31, 38, 40, 41, 42, 50

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................35

*Mace v. Van Ru Credit Corp.*,
  109 F.3d 338 (7th Cir. 1997) ....................................................25, 26

*Masters v. Wilhelmina Model Agency, Inc.*,
  473 F.3d 423 (2d Cir. 2007) ..........................................................25

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ................................. 17, 18, 19, 22, 38, 39, 40

*New York v. Reebok Int'l Ltd.*,
  96 F.3d 44 (2d Cir. 1996) .........................................................25, 32

*Perez v. Rash Curtis & Assocs.*,
  2020 WL 1904533 (N.D. Cal. Apr. 17, 2020)............................................26

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)................................................................20, 28

*Powell v. Georgia-Pacific Corp.*,
  119 F.3d 703 (8th Cir. 1997) ..........................................................25

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ..........................................................37

*Roe v. Anderson*,
  134 F.3d 1400 (9th Cir. 1998) .........................................................25

*Ronquillo-Griffin v. TransUnion Rental Screening Sols., Inc.*,
  2019 WL 2058596 (S.D. Cal. May 9, 2019) ..............................................26

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ......................................................31

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)...............................................................30

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

18 U.S.C. § 2511(1)(a)....................................................................30

18 U.S.C. § 2511(2)(g)(i).................................................................8

Fed. R. Civ. P. 23 ..............................................................2, 20, 24, 35

Fed. R. Civ. P. 23(e)(2)...........................................................23, 24, 26

Fed. R. Civ. P. 23(e)(2)(C)(ii).........................................................18, 23

Fed. R. Civ. P. 23(e)(4).....................................................................28

Wiretap Act, 18 U.S.C. §§ 2511 *et seq.*...............................8, 11, 19, 30

U.S. Const. amend. I. .............................................................20, 27, 29

## OTHER AUTHORITIES

American Civil Liberties Union, *Nationwide Coalition of Over 85
    Groups Urges Companies Commit Not to Provide Face
    Surveillance to the Government* (Jan. 15, 2019),
    https://www.aclu.org/press-releases/pressure-mounts-amazon-
    microsoft-and-google-against-selling-facial-recognition.............................42

American Law Insititute, Principles of the Law of Aggregate Litig.
    § 3.07 ....................................................................................40

*Comments of the World Privacy Forum to the Federal Trade
    Commission Regarding Competition and Consumer Protection
    in the 21st Century Hearings*, Project Number P181201
    (Aug. 20, 2018)
    https://www.ftc.gov/system/files/documents/public_comments/
    2018/08/ftc-2018-0048-d-0130-155142.pdf...........................................42

Daniel A. Crane, *Optimizing Private Antitrust Enforcement*,
    63 Vand. L. Rev. 675 (2010) .........................................................26

Shiva Stella, *Public Knowledge Urges DOJ to Scrutinize Google's Digital Advertising Practices for Antitrust Violations*, Public Knowledge (May 18, 2020), https://www.publicknowledge.org/press-release/public-knowledge-urges-doj-to-scrutinizegoogles-digital-advertising-practices-for-antitrust-violations/ .................................................................42

# INTRODUCTION

This appeal arises from Judge Breyer's approval of the parties' class settlement agreement, which resolved a decade of hard-fought litigation in a way that was fair, reasonable, and adequate for all the parties, including absent class members. A decade ago, Plaintiffs sued Google, alleging that, through its Street View vehicles program, it had illegally intercepted communications transmitted over class members' unencrypted wireless networks. While this suit proceeded (including through an interlocutory appeal to this Court), Google reached in 2013 an agreement with 38 state attorneys general to resolve their multistate investigation, which involved a payment to the states and various commitments by Google, including to not resume the alleged conduct without notice and consent. After this Court resolved the interlocutory appeal, Plaintiffs and Google spent three years in complicated jurisdictional discovery investigating, with the help of a special master, whether the Wi-Fi "payload data" for any named plaintiff had actually been intercepted. Rather than continue to litigate, the parties agreed to settle the case for additional injunctive relief and a $13 million payment from Google to be distributed to internet privacy organizations proposed by Plaintiffs and approved by the district court.

In approving that agreement, Judge Breyer considered and correctly rejected every argument raised by Objector-Appellant David Lowery (one of only two objectors)—arguments that Lowery now repeats in this Court. The efforts by

Lowery, and his counsel Ted Frank, to attack *cy pres* class action settlements root-and-branch are misguided. Where the *cy pres* mechanism is used carefully and appropriately—as it was here—it is fully consistent with Rule 23 and facilitates resolution of cases that otherwise would be nearly impossible to settle. In addition to the reasons offered by Class Plaintiffs in support of the district court's judgment, Google adds a few distinct and additional points about why the parties resolved this case as they did and why the district court was right to approve their settlement.

**First**, notwithstanding the presentation of Lowery and his counsel (who opposes class action settlements in almost any context), the *cy pres* mechanism has a long and broad history, and it has been expressly approved by eight Circuit Courts of Appeals, including this Court.

**Second**, this case presents an object lesson in the need for *cy pres* awards, as the settlement fund is otherwise non-distributable. In particular, class membership—and thus eligibility for potential recovery—turns on the contents of the enormous database that contains the fragmentary Wi-Fi data captured by Google Street View vehicles over a decade ago. This makes self-identification of class members impossible: as the district court explained, "no member of the class here can know whether Google intercepted his or her data." ER22. And an individualized claims process is equally infeasible because, as the laborious jurisdictional discovery process showed, scouring the database for a person's data requires information from

the person's decade-old Wi-Fi equipment and "would involve combing through nearly 300 million frames" of data—a hugely time-consuming and expensive process, which "would leave 99% of the class with no benefit." ER22–23.

***Third***, the process by which Plaintiffs proposed (and the district court selected) organizations to receive the *cy pres* funds was entirely proper. Google played no role in that process, and its modest past donations to some of the selected organizations do not suggest any conflict of interest.

***Fourth***, in addition to the *cy pres* award, the settlement agreement provides meaningful injunctive relief. The agreement requires Google to destroy the acquired payload data and to expand certain educational webpages that instruct users about Wi-Fi security and data privacy. The agreement also extends, for at least two more years, Google's obligation to maintain a robust internal privacy program and other requirements of the comprehensive settlement that Google reached in 2013 with 38 state attorneys general.

These factors (among others) led the district court to approve the parties' settlement agreement. This Court should affirm.

## JURISDICTIONAL STATEMENT

Google agrees that Appellant's statement of jurisdiction is complete and correct.

## COUNTERSTATEMENT OF ISSUES FOR REVIEW

1.     Whether the district court abused its discretion in approving a *cy pres* settlement without direct payments to class members given its findings that class members could not self-identify and that an effort to identify class members using would have been time-consuming, prohibitively costly, and unreliable.

2.     Whether the district court abused its discretion in approving specific *cy pres* recipients that Google had no role in selecting and whose prior connections with Google were limited to prior *cy pres* awards and modest independent donations.

3.     Whether the district court clearly erred in finding that the class benefited from the settlement's provision of injunctive relief that extended and expanded Google's legal obligations.

## COUNTERSTATEMENT OF THE CASE

### A.     Background on Google Street View and The Payload Collection

In 2007, Google launched a new feature called Street View, which provides users with panoramic, street-level photographs of roads around the United States. SER254.[1] Street View images are taken by cameras mounted on cars that drive down public roads while photographing their surroundings. *Id.*

---

[1] "SER" refers to Google's Supplemental Excerpts of Record. "ER" refers to Lowery's Excerpts of Record. "Dkt." refers to the docket entries below.

For a time, Street View vehicles were outfitted with off-the-shelf radio equipment and open-source software that passively collected network identifying information openly broadcast by Wi-Fi networks along the roads they travelled. SER253–254. Many businesses like Google gathered this basic data about Wi-Fi networks, as it enabled them to provide users with enhanced "location aware" services. *Id.* Wi-Fi networks have a limited range, making the presence of any particular network a unique geographical landmark for users to pinpoint their approximate location when satellite-based GPS is unavailable or inconvenient. *Id.* By detecting the Wi-Fi networks available in a given area, Google and other companies can provide services that, among many other things, enable people to find locally relevant information about weather conditions, shopping and restaurant options, and directions to places of interest. SER248; SER253.

In May 2010, Google learned that its Street View vehicles had also acquired so-called "payload data"—fragments of information being transmitted across Wi-Fi networks that were configured to be open (*i.e.*, networks that were not password protected or encrypted). SER245; SER248.[2] But this acquisition of payload data by

---

[2] Payload data can include "fragments of requests for URLs, files transferred across the Internet, email bodies, and instant messages, among other things." SER264. Payload data is transmitted within a "packet," which also includes a "header," which "contains network administrative information and the addressing information … necessary to transmit the data packet from one device to another." *Id.* Packets are then grouped into larger data packages called "frames" for routing over the Internet. *Id.*

Street View vehicles was subject to significant technological limitations: an in-range unencrypted Wi-Fi network must have been transmitting data at the very moment that a Street View vehicle happened to pass by. SER248. And, even then, since Google's software was designed to identify networks for location purposes, it cycled through available Wi-Fi channels at the rate of five times per second. *Id.* That means that data from a given network could have been acquired by a Street View vehicle only if it was transmitted during the one-fifth of a second that the vehicle's software could see that specific network. SER254.

All told, the Street View cars acquired three billion frames of wireless raw data, of which about 300 million frames contained "Payload Data." ER5. Google had no interest in acquiring this payload data, and has never used it in any of its products or services. SER254. Upon learning of the unwanted collection, Google promptly grounded its Street View cars, segregated and rendered inaccessible the acquired payload data, and hired a third party to review what had happened. SER249; SER254–255. Google also publicly described these events on its official blog, apologized for collecting payload data, and put steps in place to prevent such collection from occurring again. SER245; SER248; SER253.

### B. Investigations By Federal Agencies And State Attorneys General And The Assurance of Voluntary Compliance

Shortly after Google publicly disclosed its collection of payload data, federal and state agencies began investigating Google's conduct. The U.S. Department of

Justice, the Federal Trade Commission, and the Federal Communications Commission all did so and declined to take action against Google. SER226.

The Attorneys General of 38 states and the District of Columbia conducted a joint investigation. That investigation was resolved in 2013 with an Assurance of Voluntary Compliance ("AVC"). ER166. The AVC required Google to: (1) delete or destroy the "Payload Data" it had collected; (2) not collect and store "Payload Data" for use in any product or service without notice and consent; (3) maintain a privacy program as set forth in the AVC; and (4) implement a public-service and educational campaign. ER171–172. Google also agreed to pay $7 million to be divided among all 38 states' attorneys general. ER172.

## C.    Procedural History

Starting in May 2010, shortly after Google disclosed its collection of payload data, more than a dozen putative class-actions lawsuits challenging that activity were filed in courts around the country. Those cases were eventually transferred by the Judicial Panel on Multidistrict Litigation to the Northern District of California for pretrial coordination. SER319.

Plaintiffs are individuals who alleged that payload data transmitted over their unencrypted Wi-Fi networks was collected by Google. SER286. In addition to bringing claims on their own behalf, Plaintiffs sought to represent a class consisting of all individuals whose Wi-Fi payload data was collected. *Id.* Plaintiffs filed a

Consolidated Class Action Complaint in November 2010, asserting claims under the federal Wiretap Act, various state wiretap statutes, and California's unfair competition law (UCL). *Id.*

### 1. Google's Motion To Dismiss And Interlocutory Appeal

In December 2010, Google moved to dismiss Plaintiffs' complaint. Dkt. 60. As to the federal Wiretap Act claim, Google argued that the Act permits parties to acquire data transmitted over unencrypted Wi-Fi networks because the Act expressly allows parties to "intercept or access an electronic communication" when the network is "configured" for the communication to be "readily accessible to the general public." 18 U.S.C. § 2511(2)(g)(i). The district court dismissed Plaintiffs' state-law claims on preemption and standing grounds, but held that Plaintiffs' complaint stated a claim under the Wiretap Act. *In re Google Inc. St. View Elec. Commc'ns Litig.*, 794 F. Supp. 2d 1067 (N.D. Cal. 2011). The district court certified an interlocutory appeal on the Wiretap Act claim (SER240), and the Ninth Circuit affirmed. *Joffe v. Google, Inc.*, 729 F.3d 1262 (9th Cir.), *amended and superseded on reh'g*, 746 F.3d 920 (9th Cir. 2013).

### 2. Jurisdictional Discovery On Remand

The district court proceedings had been stayed during the appeal (SER242), and on remand, the parties disagreed over whether to proceed with full or limited discovery. As Google explained at the time, there were "serious questions regarding

Plaintiffs' standing" and thus "targeted jurisdictional discovery" was needed to determine "whether any communications from Plaintiffs' unencrypted Wi-Fi networks were actually acquired by Google." SER227. That was because a plaintiff's communications could only have been acquired by Google under the following conditions: (1) the plaintiff had maintained an unencrypted Wi-Fi network in the relevant period; (2) a Street View vehicle passed within range of that network; and (3) substantive communications (and not just technical network data) were transmitted within the precise fraction of a second when the Street View vehicle passed by and acquired payload data from the network. The court agreed with Google, "allow[ing] limited discovery on the issue of standing." SER222.

The parties disagreed again over how best to proceed with jurisdictional discovery. While both sides agreed that it would be necessary to search the acquired Street View data (Dkt. 117 at 1), Plaintiffs sought to have the entire data set produced to them for their own analysis (*id.*). Google objected to Plaintiffs' plan given substantial privacy concerns, and instead Google proposed to retain a third party to conduct Plaintiffs' requested searches or to have the court appoint a special master (*id.* at 4–5). Magistrate Judge Maria-Elena James recommended appointing a special master (SER221), and the district court adopted that recommendation (SER209).

The jurisdictional discovery overseen by the Special Master into the standing of the 18 named plaintiffs took three years. *See* ER5. First, the Special Master had

"to organize the data into a searchable database." ER5. That required recovering and forensically preserving the data on the hundreds of individual hard drives used by Google's Street View vehicles. *See* ER168. The Special Master also had to develop custom software for processing the raw data before organizing it into a database. Further complicating matters, the basic networking information—which could identify plaintiffs' Wi-Fi networks—had been segregated from the payload data. *See id.* The Special Master had to match the frames containing basic networking information with the corresponding frames of payload data. Finally, the Special Master had to convert the raw, machine-readable data into human-readable form. *See id.*

But that was only the beginning. The Special Master then spent the next two years "design[ing] and conduct[ing]" the "complex technical searches" necessary to identify whether the payload data contained any communications intercepted from Plaintiffs. ER5. The Special Master developed a master search protocol, and then considered and performed a variety of methods for searching the data set. *Id.* The Special Master implemented three search methodologies: for email addresses, for MAC addresses, and for SSIDs nearby certain GPS coordinates. *Id.* Hits on these searches would indicate that basic networking information had been collected, but further inquiry was required to determine if payload data from these networks had been collected.

### 3. The Class Settlement Agreement

At the end of the Special Master's three-year, intensive process, the parties still were faced with a dispute over the Special Master's findings, with open questions as to whether the Street View vehicles had captured *Plaintiffs'* data sufficient to confer standing under the Wiretap Act. Facing these uncertainties and more after having already spent eight years litigating the case about events that had ended in 2010, the parties "engaged in extensive arm's length settlement negotiations, which spanned over 5 months and included a mediation session." SER131.

In June 2018, Google and plaintiffs reached a settlement for a class comprised of "all persons who used a wireless network device from which Acquired Payload Data was obtained." ER181; *see also* ER181–201 ("Settlement Agreement"). The Settlement Agreement included both monetary and injunctive relief for the class. ER187–190. The monetary component consisted of a $13,000,000 payment by Google into a non-reversionary Settlement Fund. ER187. After attorneys' fees and costs, incentive awards to named plaintiffs, and claims administration costs, the remainder of the fund would be divided among *cy pres* recipients dedicated to promoting and protecting class members' privacy interests. ER188–189. The Settlement Agreement provided that Plaintiffs, and not Google, would be

responsible for selecting the *cy pres* recipients to be proposed for approval by the district court. ER188.

The parties opted to use a *cy pres* structure for the monetary component of the settlement. That decision was influenced by the parties' experience with the jurisdictional discovery process, which underscored the considerable practical difficulties of determining whether any individual was actually a class member who had had their payload data collected by Google's Street View vehicles. Indeed, the only way to identify prospective Class Members was to reprise a version of that cumbersome and costly process, which would involve combing through nearly 300 million frames of collected payload data and trying to associate it with individual applicants. *See* SER117–118.

Not only that, but even attempting such a process would have required prospective Class Members to know the MAC address of the Wi-Fi router they were using between 2007 and 2010—otherwise, there would be no way of determining whether any data transmitted by that Wi-Fi router was acquired by Google. As a practical matter, this limitation would have left many (if not most) prospective Class Members with no ability to seek monetary relief through a claims process at all. But even for those individuals who could provide their 2007–2010 router information, confirming that Google had acquired their payload data would be no mean feat.

Jurisdictional discovery focused solely on the 18 named plaintiffs showed that searching the massive database was a complex, expensive, and time-consuming process. SER56. Replicating it for the much larger number of people who might submit claims would take years and cost millions. *Id.* At worst, the process itself would exhaust the settlement fund before any claims were paid. *Id.* At best, this process would leave only *de minimis* distributions to the small percentage of Class Members who could and would provide the necessary identifying information. *Id.* And even that would serve only to arbitrarily and minimally reward the few Class Members who happen to have retained outdated computer equipment. *Id.*

The Settlement Agreement also includes multi-pronged injunctive relief that imposes meaningful obligations on Google. ER189–90. The agreement requires Google to "destroy all Acquired Payload Data," and it further prohibits Google from "collect[ing] and stor[ing] for use in any product or service Payload Data via Street View vehicles, except with notice and consent." *Id.* The agreement also extends for at least an additional two years Google's obligations in the AVC, including the requirement to maintain a robust internal privacy program. *Id*. The agreement further requires Google to host and maintain educational webpages about configuring wireless networks securely, and removing wireless networks from inclusion in Google's location services. *Id.* While Google had created similar webpages in connection with the AVC, the Settlement Agreement required additional

information. *Id.* To comply with those additional requirements, Google revised and expanded its educational webpages, providing more and more-up-to-date information to protect the privacy and security of internet users' communications. SER2–3.

### 4. Judge Breyer's Approval Of The Settlement Agreement

Plaintiffs moved for preliminary approval of the Settlement Agreement. SER83. At preliminary approval, Plaintiffs proposed eight *cy pres* recipients: (1) The Center on Privacy & Technology at Georgetown Law, (2) Center for Digital Democracy, (3) Massachusetts Institute of Technology's Internet Policy Research Initiative, (4) World Privacy Forum, (5) Public Knowledge, (6) Rose Foundation for Communities and the Environment, (7) American Civil Liberties Union Foundation, Inc. ("ACLU"), and (8) Consumer Reports, Inc. SER97. Consistent with the terms of the Settlement Agreement, Google played no role in proposing or selecting those recipients. SER81. A ninth organization, the Electronic Privacy Information Center ("EPIC"), petitioned the district court to be included as a *cy pres* recipient. Dkt. 169. EPIC had filed an amicus brief in support of Plaintiffs and against Google during the earlier interlocutory appeal. Brief of Amicus Curiae EPIC in support of Appellees, *Benjamin Joffe, et al. v. Google, Inc.*, No. 11-17483 (March 30, 2012). Plaintiffs did not oppose EPIC's petition.

Google searched its records over the last 10 years to identify any relationship with the proposed *cy pres* recipients. SER82. Google disclosed donations to three of the proposed recipients: "unrestricted donations for research totaling $225,000 to World Privacy Forum in the period 2016-2018," "donations for issues unrelated to privacy totaling approximately $1,005,000 to Public Knowledge in the period 2014-2018," and "research funding to [the Massachusetts Institute of Technology] to support certain members of the faculty associated with the [Internet Policy Research Initiative]." *Id.* The proposed *cy pres* recipients made similar disclosures.[3]

The district court held a hearing on the motion (SER70) and granted preliminary approval (SER64). Before the final approval hearing, only two putative class members objected. Objector David Lowery, represented by counsel who has made a career of objecting to class settlements, especially *cy pres* settlements, argued

---

[3] SER145 (Center for Digital Democracy) ("We neither solicit nor accept funding from corporations, including Google and its parent, Alphabet, Inc."); SER156 (MIT IPRI) ("MIT IPRI has not received any funds from Google or Alphabet. Other research units at MIT may have received Google funds, but none goes to support IPRI work."); SER161(World Privacy Forum) ("[W]e have accepted *de minim[i]s* general support funding from Google after 2013. We have no current funding from Google. For previous funding, Google agreed to abide by our funding terms, which provides for complete independence."); SER176 (Public Knowledge) (disclosing specific donations from Google); SER190 (ACLU) ("The ACLU has received over $2.5 million from Google/Alphabet primarily through employee giving, employer matches, and employee-driven donations, but neither Google nor Alphabet has otherwise been a significant ACLU donor."); SER205 (Consumer Reports) ("Consumer Reports has not received any philanthropic investments from Google or its parent company Alphabet, Inc within the last three years.").

that the Settlement Agreement was unfair, unconstitutional, and unethical. ER100. The thrust of Lowery's arguments was that courts may never approve awards of class settlement funds to *cy pres* recipients when the fund could instead be distributed to any class members, however few in number, and regardless of how poorly doing so would serve the rest of the class. ER116–121. Lowery argued that the injunctive relief was "illusory" because it duplicated the relief in the 2013 AVC. ER 120. Lowery also alleged that preexisting relationships between Google and certain of the *cy pres* recipients undermined the value of the settlement. ER126–127.

The only other objector (David Franco) submitted a one-page letter raising similar arguments. Dkt. 192. And a group of state attorneys general filed an amicus brief objecting to the Settlement Agreement and echoing many of Lowery's attacks on *cy pres*-only settlements. ER82.

After holding a fairness hearing on February 28, 2020, which included arguments from Class Plaintiffs, Google, Lowery, and a representative from the Arizona Attorney General's Office (ER36), the district court issued a 28-page order approving the settlement (ER3–30). In its comprehensive decision, the court found that a *cy pres* distribution best benefited the class because the settlement fund was otherwise "non-distributable," rejecting Lowery's argument that some claims process was feasible. ER20. The court found that it would be impossible for class members to self-identify: "[U]nlike a case in which a class member could self-

identify as having bought, for example, a particular brand of cereal during the class period," the court explained, "no member of the class here can know whether Google intercepted his or her data" because "[t]he only evidence is the intercepted data, and that evidence is not in the class member's possession." ER22.

Examining the data to determine class membership, meanwhile, would be costly and time-consuming, requiring the parties to "comb[] through nearly 300 million frames of collected payload data and try[] to associate it with individual Class Members." *Id.* (quoting SER55). "Even assuming that … process would work," it would not be "desirable." ER23. Only a small fraction of a class would be "able to file a claim," which "would leave 99% of the class with no benefit from the Settlement Fund." ER23. And if there were a higher-than-expected claims rate, that would only "diminish the success of Lowery's plan." ER23.

A *cy pres* settlement, on the other hand, would put the "'fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" ER24 (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)). Large "'contributions to charities related to the plaintiffs' causes of action arguably do more good for the plaintiffs than would a miniscule sum of money distributed directly to them.'" ER24 (quoting 4 Newberg on Class Actions § 12:26 (5th ed. 2019 update)). That was especially so given that the *cy pres* recipients were "some of the most effective advocates for internet privacy in the country" and "the award would

increase the funding for their work and likely yield actual improvements to internet privacy." ER24. And to the extent Lowery was arguing that "settlements providing direct payments to class members are always preferable to *cy pres*-only settlements," the court ruled that "controlling authority holds to the contrary." ER24 (citing *Lane v. Facebook, Inc.*, 696 F.3d 811, 819–25 (9th Cir. 2012); *Nachshin*, 663 F.3d at 1038; *In re Google Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 327–28 (3d Cir. 2019)). In sum, the district court reasoned that "[a] settlement that benefits 1% of the class, and that has no benefit to 99% of the class, is not so obviously superior to a *cy pres*-only settlement that the Court must reject this settlement as unfair." ER23. The court found the *cy pres* award "adequate" under Fed. R. Civ. P. 23(e)(2)(C)(ii). ER25.

The district court also found that the injunctive relief was "also adequate." ER25. The court rejected the arguments by Lowery and the state attorneys general that the injunctive relief merely duplicated earlier relief in the AVC. ER25. While it was true that both agreements required Google to destroy the acquired Payload Data, "this settlement pertains to conduct from 2007 to 2010," "the conduct has ceased," and "the AVC was in 2013—so the idea that there is a lot more that can be done in terms of retroactive injunctive relief is flawed." ER25. The settlement also "meaningfully provide[d]" other injunctive relief too. ER25. It "extends Google's compliance with the AVC by about two years," and "if there is an appeal, it could

extend longer." ER26. Google also made "meaningful changes" to its website and disclosures that it "would not have made without the settlement." ER26. What is more, the Settlement Agreement required "reporting to Plaintiffs on a yearly basis," and "the Court maintains jurisdiction over the injunctive relief to make sure it is complied with." ER26.

The district court approved the *cy pres* recipients, with some modifications. The court reallocated the shares of the *cy pres* among the recipients so that the funds would be "divided equally," and added EPIC as a recipient. ER27 & n.12. The court specifically found that the distributions were "tethered to the nature of the lawsuit, the objectives of the Wiretap Act, and the interests of absent Class Members. ER27. Moreover, the recipients were "independent organizations with a track record of addressing consumer privacy concerns, who will commit to use the funds to promote the protection of Internet privacy." ER27. The court also "scrutinized the Settlement closely for signs that the selection of *cy pres* recipients may 'answer to the whims and self-interests of the parties, their counsel, or the court,'" and found no relationship between proposed recipients and Class Counsel, Google, or the Court that undermines the fairness of the Settlement to Class Members." *Id.* (quoting *Nachshin*, 663 F.3d at 1039).

The district court issued final judgment. ER30. Lowery appealed. ER31.

## SUMMARY OF ARGUMENT

The district court correctly granted final approval to the parties' proposed class action settlement. This Court should affirm.

***Cy Pres Settlement.*** *Cy pres* relief provides the best available mechanism to provide meaningful benefits to classes in a few, narrowly circumscribed cases. These include when funds cannot feasibly be distributed to class members in meaningful amounts after administrative and other costs are paid—a situation present when class members are not easily identified and administrative costs of distribution are high. In such circumstances, *cy pres* awards are fully consistent with Rule 23 and, indeed, preferable because unlike miniscule individual payouts to a small fraction of the class, *cy pres* awards can fund activities that provide clearly traceable benefits to the entire class. Nor do such settlements violate the First Amendment. No speech is compelled. And even if there would be compelled speech absent any opt-out right, the opt-out process satisfies the First Amendment no less than it satisfies due process. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

This is a paradigmatic case in which a *cy pres* settlement is appropriate. It is practically impossible to identify the members of the class. The only way to confirm class membership would be to conduct searches of the 300-million-frame Street View database, but, as jurisdictional discovery into the payload data of just 18 named Plaintiffs demonstrated, it is simply infeasible to conduct those searches efficiently

or at scale. That much is undisputed—Lowery makes no attempt to argue that the claims administrator could replicate that process for a substantial portion of the class.

Self-certification would not work either. Although Lowery proposes that approach as the centerpiece of his arguments on appeal, he offers no response to the district court's finding that the individual class members lack the information needed to self-identify as members of the class. Class membership turns on whether an individual's Wi-Fi payload data was collected. But, as the district court correctly found, determining whether that happened requires access to "the intercepted data, and that evidence is not in the class member's possession." ER 22–23. Effectively conceding as much, Lowery suggests that putative class members can self-identify just as easily as Plaintiffs made allegations in their complaint. That confuses two very different things. Even if such allegations may be sufficient to get a lawsuit past the pleadings stage, they are not proof of a claim—and thus cannot be the basis for establishing actual class membership and recovery in a claims-settlement process.

***Selection Of Cy Pres Recipients.*** Lowery's attack on the Settlement Agreement based on the selection of the particular *cy pres* recipients is equally misguided. Google did not propose, let alone select, *any* of the recipients. Instead, Class Counsel proposed them, and the district court made the final selection. Without exception, moreover, the recipients are established, reputable non-profits working to promote Internet privacy, meaning the payments are "tethered to the nature of the

lawsuit and the interests of the silent class members." *Nachshin*, 663 F.3d at 1039.

Moreover, the district court "scrutinized the Settlement" and found "no relationship between the proposed recipients and … Google … that undermines the fairness of the Settlement." ER27. That factual finding was squarely in line with this Court's controlling decision in *Lane*. 696 F.3d at 821–2 (approving settlement even though "Facebook retained and will use its say in how *cy pres* funds will be distributed").

Lowery advocates a heightened standard, which he admits conflicts with *Lane*. Br 16. Beyond the fact that there is no reason to depart from *Lane*, however, the settlement satisfies Lowery's heightened standard—which requires a "prior affiliation" between the defendant and the recipient so "significant" that it "would raise substantial questions about whether the award was made on the merits." Br. 44. Most of the recipients have never received funds from Google and have no affiliation with Google whatsoever. A few of the recipients have benefited from prior *cy pres* awards or received donations from Google. But these affiliations are not "significant" and do not raise "substantial questions" about the independence of the non-profits in advancing the cause of Internet privacy. Indeed, many of the recipients have a track record of criticizing Google's conduct.

***Injunctive Relief.*** As much as Lowery pretends otherwise, this is not a "*cy pres*-only settlement." Br. 17. The Settlement Agreement includes meaningful injunctive relief. It builds on relief obtained by a coalition of dozens of state

attorneys general. Not only does the injunctive relief create binding legal obligations—enforceable by the district court—to comply with Google's commitments to the state attorneys general, the settlement also extends the duration of Google's obligations by several years, and requires Google to make substantial new educational disclosures. The district court's finding that the injunctive relief provided meaningful benefits to the class was not "clearly erroneous." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020).

## ARGUMENT

I. *CY PRES* DISTRIBUTION BEST BENEFITS THE CLASS BECAUSE IDENTIFYING AND PAYING INDIVIDUAL CLASS MEMBERS IS NOT FEASIBLE

*Cy pres* relief is "fair, reasonable, and adequate" (Fed. R. Civ. P. 23(e)(2)) where "the proof of individual claims would be burdensome or distribution of damages costly." *Lane*, 696 F.3d at 818–19. This is an especially appropriate case for a *cy pres* based settlement, considering "the effectiveness" of the various "proposed method[s] of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). As the district court found, it would have been infeasible here to distribute direct payments to class members. ER22–24. The only method for identifying class members—a version of the forensic process used by the Special Master to investigate whether any of the named plaintiffs had their payload data collected—would have been costly, time-consuming, and often impossible. *Id.* And

the self-certification process that Lowery offers as an alternative was impossible because class members lacked the facts needed to self-identify. *Id.* The district court's conclusion that *cy pres* relief best benefited the class given the lack of feasible alternatives was correct—and certainly not clear error.

## A. *Cy Pres Relief* Is Appropriate Under Rule 23 For Settling Class Actions Like This One

*Cy pres* relief offers the best available mechanism to deliver meaningful benefits to classes in a few, narrowly defined cases. In these cases, *cy pres* relief is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The *cy pres* settlement approved here illustrates how a properly guided exercise of equitable discretion avoids the abuses that Lowery derides, while benefiting class members far more than the *de minimis* payments to a trivial proportion of the class that (if Lowery has his way) would be the only permissible remedy.

A settlement containing only (or predominantly) *cy pres* relief is appropriate when "the proof of individual claims would be burdensome or distribution of damages costly." *Lane*, 696 F.3d at 819–822 (approving *cy pres*-only settlement in privacy class action against Facebook); *accord In re: Google Referrer Header Privacy Litigation*, 869 F.3d 737, 741 (9th Cir. 2017) (approving *cy pres*-only settlement); *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d at 320–21, 328 (approving *cy pres*-only settlement in 23(b)(2) class action involving alleged privacy violation). Indeed, most courts of appeals recognize that "*cy pres*

distributions are most appropriate where further individual distributions are economically infeasible." *In re Baby Prods. Antitrust Litig.,* 708 F.3d 163, 173 (3d Cir. 2013); *accord Klier v. Elf Atochem North America, Inc.,* 658 F.3d 468, 475 & n.15 (5th Cir. 2011); *In re Pharm. Indus. Average Wholesale Price Litig.,* 588 F.3d 24, 33–34 (1st Cir. 2009); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007); *Powell v. Georgia-Pacific Corp.,* 119 F.3d 703, 706 (8th Cir. 1997); *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 345 (7th Cir. 1997); *New York v. Reebok Int'l Ltd.,* 96 F.3d 44, 49 (2d Cir. 1996).

This Court expressly blessed *cy pres*-only settlements in *Referrer Header*. 869 F.3d at 741–42. Consistent with "the teachings of *Lane*" and the "prior endorsement of *cy pres* awards" in *Nachsin, Referrer Header* held that *cy pres*-only settlements are "appropriate where the settlement fund is 'non-distributable' because 'the proof of individual claims would be burdensome or distribution of damages costly.'" *Id.* (quoting *Lane*, 696 F.3d at 819). And it affirmed approval of "a class settlement that benefit[ted] members through programs on privacy and data protection instituted by the *cy pres* recipients." *Id.* While *Referrer Header* was vacated on other grounds by the Supreme Court (*see Frank v. Gaos*, 139 S. Ct. 1041 (2019)), it "remains viable as persuasive authority" (*Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998)). And it is testament to the opinion's persuasive force that district courts continue to cite its "extensive discussion of *cy pres*-only settlement agreements" as

"instructive." ER4 n.1; *see also, e.g.*, *Perez v. Rash Curtis & Assocs.*, 2020 WL 1904533, at *18 (N.D. Cal. Apr. 17, 2020); *Ronquillo-Griffin v. TransUnion Rental Screening Sols., Inc.*, 2019 WL 2058596, at *6 (S.D. Cal. May 9, 2019).

As this Court recognized in *Referrer Header*, direct payments to class members may not be feasible where class members are not easily identified and administrative costs of distribution are high. "*Cy pres* recovery is … ideal for circumstances in which it is difficult or impossible to identify the persons to whom damages should be assigned or distributed." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997). Any distribution of proceeds to sprawling settlement classes of unidentifiable individuals either has to take any claimant's assertions at face value or include a prohibitively expensive verification process. And then the claims administrator would have to process class members' payment information and pay them—each step a costly undertaking. Even where the class in the aggregate is harmed by a defendant's alleged conduct, "identifying the actual people who suffered injury and issuing them a check is often so expensive that administrative costs swallow the entire recovery." Daniel A. Crane, *Optimizing Private Antitrust Enforcement*, 63 Vand. L. Rev. 675, 683 (2010). In other words, the funds end up going mainly to claims administrators, which is not "fair, reasonable, and adequate" to class members. Fed. R. Civ. P. 23(e)(2).

In these circumstances, *cy pres* awards are often preferable. Indeed, unlike miniscule individual payouts to a small fraction of the class, *cy pres* awards can fund activities that provide clearly traceable benefits to the entire class, such as advocacy for public or private policy changes favorable to the class, or research that may lead to changes in policy or business practices or consumer education or other services related to the allegations in the suit. These are meaningful benefits to the class.

These meaningful benefits are not outweighed by Lowery's makeweight First Amendment concerns. Br. 42–43. Relying principally on *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018), Lowery's argument presumes that *cy pres* relief takes funds from class members and gives those funds to third parties. Br. 42. But that is not so. *Cy pres* relief is nothing like *Janus*, where state law compelled public employees to subsidize a union, even where they "strongly object to the positions the union takes in collective bargaining and related activities." 138 S. Ct. at 2460. The subsidy in *Janus* came in the form of a monthly assessment—an agency fee— which was taken directly out of the employee's paycheck. *Id*. at 2461. Here, by contrast, neither Lowery nor any other absent class members has been compelled to pay money to the *cy pres* recipients. The money going to those entities belongs to Google, which voluntarily agreed to distribute funds to entities selected by the district court pursuant to the Settlement Agreement. ER187. This case simply does not involve "compelled subsidization of private speech." *Janus*, 138 S. Ct. at 2464.

On top of that, even if there were some conceivable compelled speech issue here, it is solved by the fact that, consistent with Rule 23(e)(4), the Settlement Agreement entitled class members to opt out of the settlement for any reason. *See* ER191. That option is open to any class member, including Lowery, who does not want to be associated with speech undertaken by a *cy pres* recipient. The Supreme Court held more than 30 years ago that such opt-out provisions generally satisfy the due-process rights of absent class members. *Shutts*, 472 U.S. at 812. The Court's rationale for approving opt-out processes in *Shutts* applies with equal force here. "[T]he Constitution does not require more to protect what must be the somewhat rare species of class member who is unwilling to execute an 'opt out' form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so." *Id.* at 813.

Contrary to *Shutts*—which the district court cited (ER25 n.10), but Lowery ignores—Lowery contends that "silence is not consent." Br. 43 (citing *Knox v. SEIU, Local 1000*, 567 U.S. 298, 312–22 (2012)). But as *Shutts* recognized, the class-action system is based on the proposition that individuals with little to gain from pressing individual actions can be presumed to join in a collective action unless they affirmatively opt-out. *Knox* does not suggest otherwise: that case did not impugn the effectiveness of opting out, but instead rejected an effort to nullify an opt-out

arrangement. 567 U.S. at 314. *Knox* thus undercuts Lowery's First Amendment claim, and his objections provide no basis for undoing the Settlement Agreement.

**B.** **The Settlement Here Is Non-Distributable Because It Was Not Feasible To Create A Claims Process Replicating The Special Master's Investigation**

Lowery's broad-based attack on the parties' *cy pres* settlement largely ignores the actual circumstances of this case. The alternative to *cy pres* here was a claims process whereby putative class members—from an estimated class size of 60 million, though the actual number is almost impossible to know—would come forward and make a showing that they were among the people who had payload data collected by Google's Street View vehicles during the relevant period. But as the district court found and as Lowery does not dispute, that process would have been administratively unfeasible, incredibly expensive and time-consuming. ER22. The district court "observed firsthand " that the parties went through a similar process— at a fraction of the scale as would be required for a full claims process—in connection with jurisdictional discovery, and even that limited inquiry took three years to complete and imposed a significant burden on the parties and the Special Master who administered the process. ER22; *see also* ER5, ER13, ER17.

Following this Court's remand, the threshold question here was whether any of the named plaintiffs had actually had their payload data collected by Google's Street View vehicles—a prerequisite for their ability to prove Article III standing, as

well as class membership and their right to recover under the Wiretap Act. ER184 (defining class membership); *accord* 18 U.S.C. § 2511(1)(a); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To help manage that process, which involved highly technical searches of the raw Wi-Fi data that was collected by Google's vehicles, the Court appointed a Special Master. SER209. The amount of raw data that had to be searched looking for evidence associated with the named plaintiffs or their Wi-Fi routers was immense: "three billion frames of wireless raw data, of which about 300 million contained 'Payload Data'—the kind of frames that could contain communications." ER5; *see also* SER11. And, the Special Master's process was "intensive." ER5; *see also* SER11.

Merely examining the data for the 18 named plaintiffs took three years—one year "to organize the data into a searchable database" and two more years "to design and conduct" the "complex technical searches" necessary to identify whether the data contained any intercepted communications from Plaintiffs. ER5; *see also* SER11. This process cost nearly $1 million. *See* SER26 (stating that Plaintiffs' half of the Special Master's fees was "$487,476.05"); SER213 (ordering that the fees be split "50/50"). And to enable the Special Master's targeted searches, Plaintiffs had to provide "forensic evidence of their wireless network equipment (including MAC addresses, email addresses, and SSIDs)" from the settlement period (2007 to May 2010). ER5; *see also* SER11. Lowery does not dispute any of these facts.

This experience informed the parties' settlement, and it confirms that a *cy pres* approach was not only reasonable but necessary here. As Judge Breyer explained, "demonstrating membership in the class" would "requir[e] a process akin to the three-year process undertaken by the Special Master." ER13. To even begin the process, putative class members would need to have kept their now-outdated wireless network equipment from a decade ago. And for the few that still have their 10-years-old equipment (or records reliably showing what the MAC address(es) were for their old Wi-Fi routers), the process of evaluating whether prospective claimants are actually class members with a viable individual claim would be "painstaking," time-consuming, and costly. ER22. Just as the Special Master had to do for the named plaintiffs, a series of complicated and likely inconclusive searches would have to be run across the massive database looking for fragments of data that might be associated with each claimants' Wi-Fi router. Given that this process cost nearly $1 million just for the 18 named plaintiffs, replicating it for a multi-million-member class would almost certainly eat up the entire $13 million settlement fund.

In short, this case is one of the cases in which a "*cy pres*-only settlement" is "appropriate"—where "the proof of individual claims would be burdensome or distribution of damages costly." *Referrer Header*, 869 F.3d at 741 (quoting *Lane*, 696 F.3d at 819); *accord In re Baby Prod. Antitrust Litig.*, 708 F.3d at 173; *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990)

("Federal courts have frequently approved [the *cy pres*] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly."); *Reebok Int'l Ltd.*, 96 F.3d at 49 (approving *cy pres* where direct "distribution 'would be consumed in the costs of its own administration.'").

## C. Self-Certification Is Not An Available Mechanism For Identifying Class Members In This Case

Lowery does not dispute this reality. Indeed, he largely ignores it, as he did in attacking the Settlement Agreement below. Instead, Lowery argues that the parties should have established a claims process whereby individual class members would simply *self-certify* that they are members of the class, as he purports to have done in objecting, with no actual searches necessary. Br. 34–36. But as the district court rightly found, the circumstances of this case simply do not allow for the kind of self-certification Lowery imagines. And Lowery has waived any challenge to the district court's factual findings by failing to dispute them. *Int'l Bhd. of Teamsters, Local Union No. 1224 v. Allegiant Air, LLC*, 788 F.3d 1080, 1090 n.3 (9th Cir. 2015).

The class definition is limited to "persons who used a wireless network device from which Acquired Payload Data was obtained." ER184. Acquired Payload Data is "the Payload Data acquired from unencrypted wireless networks by Google's Street View vehicles operating in the United States from January 1, 2007 through May 15, 2010." ER183. Thus, to qualify as a class member who could claim a share

of any recovery in this case, an individual would have to establish not merely that they used a wireless network device at a relevant time or place, but also that ***Google actually collected Payload Data from that device during the class period***.

The problem is, putative class members lack access to the evidence needed to make that showing and thereby establish their class membership. ER22–23. The Payload Data is in Google's possession, and a copy of it is in the custody of the Special Master. As discussed above, querying that data to find even *potential* payload data corresponding to a particular individual is a highly technical and time-consuming process. But without going through some version of that laborious investigation into a dataset outside of their control, no individual can possibly know whether their payload data was collected by Google's Street View vehicles. Without undertaking that process, no one could attest under penalty of perjury that their individual data was collected.

It follows that no individual can, merely by self-certification, establish the facts necessary to qualify as an actual member of the class. Lowery tacitly admits as much; he does not dispute the district court's finding that "no member of the class here can know whether Google intercepted his or her data" because "[t]he only evidence" of class membership "is the intercepted data, and that evidence is not in the class member's possession." Br. 34–35 (quoting ER 22–23).

Given that, the self-certification process that Lowery envisions—and that is the centerpiece of his attack on the parties' *cy pres* settlement—is not workable or appropriate. An individual who attested merely that they used an unencrypted Wi-Fi network during the relevant period and had their home or business appear on Google Maps—even assuming those facts were true—would not be a member of the class. Additional information, outside of that individual's personal knowledge, would be required to determine class membership and thus the declarant's right of recovery.

That reality distinguishes this case from those on which Lowery relies, where self-certification was used to establish class membership in connection with an individual claims process. *See* Br. 29–30. For example, in *In re Google Plus Profile Litigation*, the plaintiffs were users of a social-networking service who alleged that they put private information in profile fields that were exposed by a software bug. There, class members could readily self-identify because the facts needed to establish membership all concerned actions taken by the class members themselves—information that they knew or could be expected to know. *See In re Google Plus Profile Litig.*, 5:18-cv-06164-EJD, Dkt. 57-2 at 28 (Jan. 6, 2020). But that is not the situation here. As the district court found, this case is "unlike a case in which a class member could self-identify as having bought, for example, a particular brand of cereal during the class period." ER22.

Lowery (Br. 2, 15, 35–36) relies on *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), but that case only further undercuts his position. *Briseno* did not address a *cy pres* settlement; instead, it held that Rule 23 does not require a determination of administrative feasibility as a prerequisite to class certification. *Id.* at 1123. Nor does *Briseno* support Lowery's self-identification proposal. *Briseno* never held that "self-serving affidavits" are appropriate to identify class members in all cases—the Court simply found that the affidavits in that case were not a *per se* barrier to class certification or a violation of due process. *Id.* at 1124–25, 1132. Moreover, the kinds of affidavits at issue were totally different. In *Briseno*, class membership turned on whether someone "purchased Wesson-brand cooking oils labeled '100% Natural' during the relevant period" (*id.* at 1123)—information plainly available to putative class members and that could readily be sworn to in a declaration. That is simply not the case here, and *Briseno* says nothing about a situation where a self-identification affidavit is impossible.

Aware of this difficulty, Lowery asserts that not allowing self-certification would be "inconsistent" with how the named plaintiffs are treated for purposes of their standing to settle the case and their service awards. Br. 34. At the pleading stage of a federal-court lawsuit, a plaintiff can establish standing based on "mere allegations," as the named plaintiffs did here. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). But, if plaintiffs actually want to recover on their claims, they need

to offer *proof* of standing and class membership—"with the manner and degree of evidence required at the successive stages of the litigation." *Id.*; *cf. Briseno*, 844 F.3d at 1131 ("if the case proceeds past the certification stage, the plaintiff class must carry the burden of proving every element of its claims to prevail on the merits"). The fact that the named plaintiffs were found to have standing to settle the case based on the complaint's allegations—that "on information and belief" plaintiffs' communications were collected by Google (*e.g.*, SER290)—does not mean that such allegations would establish class membership as part of a claims-recovery process.

Indeed, proving these allegations was the whole point of the jurisdictional discovery process below. Self-certification through declarations was never an option for the named plaintiffs to establish their standing and ability to recover. Instead, as discussed above, those Plaintiffs had to engage, through the Special Master, in a detailed and highly technical set of iterative searches of the Payload Data, information that was never in their possession. ER5 (summarizing the "intensive discovery on the issue of standing"). Even at the end of the process, there *still* were questions about what that evidence showed. It was in part to avoid litigation of that complicated and fact-intensive issue that the parties settled. And it was to avoid a similar process with countless potential class members that the parties concluded that a *cy pres* approach was the only feasible way to resolve the case. Lowery cannot short-circuit that process with boilerplate declarations that he is entitled to recover.

Lowery also points to the "service awards" made to the named plaintiffs as part of the Settlement Agreement. Br. 35. But those were not claims payments to those individuals, and they are not akin to what absent class members would be seeking in a claims process. Instead, those were incentive payments to reimburse those individuals for their service as named plaintiffs, which "are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). They are "compensat[ion] … for work done on behalf of the class"—not recovery on a claim. *Id.* They provide no basis for allowing absent class members to recover merely based on declarations that could not possibly establish their actual status as class members with a viable claim against Google.

Finally, the fact that Lowery submitted a declaration as part of his *objection* to the settlement does not mean that such a declaration would be sufficient for *recovery* by an absent class member. For starters, no one challenged Lowery's class membership, so the issue never was addressed. But the status of an objector (who wants out of the settlement) is distinct from the status of someone who wants to recover a claim under it. Lowery cannot use his own objection as a bootstrap for recovery by individuals who clearly cannot demonstrate that they are actually part of the class. The district court's approval of *cy pres* relief should be affirmed.

## II. GOOGLE DID NOT SELECT THE *CY PRES* RECIPIENTS AND HAS NO DISQUALIFYING RELATIONSHIP WITH ANY OF THEM

Beyond his general broadside attacks on the *cy pres* settlement framework, Lowery attacks the choice of the particular *cy pres* recipients in this case. But nothing about the identity or manner of selection of the *cy pres* recipients provides any reason for this Court to conclude that the district court abused its discretion in approving the settlement.

The touchstone for evaluating the propriety of a *cy pres* award is whether the "selection of *cy pres* beneficiaries [was] not tethered to the nature of the lawsuit and the interests of the silent class members," such that the selection process "answer[ed] to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1039. As to Google's role, these factors are undisputed: Google did not select—or indeed play any meaningful role in the selection of—the *cy pres* recipients. That alone disposes of Lowery's objections. And the supposed prior affiliations between Google and certain of the *cy pres* recipients cast no doubt on the propriety of the awards, whether under this Court's established test or the new test proposed by Lowery. In sum, the district court did not "abuse[] its discretion." *Lane*, 696 F.3d at 822.

### A. Google Had No Role In The Selection of *Cy Pres* Recipients

To begin, Google did not select—or even suggest—any of the proposed *cy pres* recipients. Under the terms of the Settlement Agreement, Plaintiffs' counsel

alone was responsible for identifying proposed *cy pres* recipients and proposing the amount of their respective awards from the Net Settlement Fund. ER188. While the Settlement Agreement required Plaintiffs to disclose their proposed recipients to Google—so Google could determine whether there were any conflicts of interest— the Agreement did not allow Google to veto any of Plaintiffs' choices, let alone to propose its own. Lowery asserts that "Google left itself the power to object to individual recipients" (Br. 25 (citing ER188)), but that is both misleading and irrelevant. The Settlement Agreement merely provided that Plaintiffs "consult with Google in good faith regarding any concerns Google may have" (ER188); it did not give Google any right or power of objection. And, indeed, Plaintiffs made no changes to their list of proposed recipients after disclosing them to Google. ER188; SER13.

Moreover, the ultimate choice of the actual *cy pres* recipients was made by the District Court—not by Plaintiffs and certainly not by Google. In exercising that discretion, Judge Breyer "scrutinized the Settlement closely for signs that the selection of *cy pres* recipients may 'answer to the whims and self-interests of the parties, their counsel, or the court,'" and found "no relationship between proposed recipients and Class Counsel, Google, or the Court that undermines the fairness of the Settlement to Class Members." ER27 (quoting *Nachshin*, 663 F.3d at 1039). Indeed, the court's ultimate award differed from what the Plaintiffs had proposed.

Judge Breyer approved an application by the Electronic Privacy Information Center ("EPIC") for a portion of the *cy pres* award even though EPIC had not been selected by Plaintiffs. ER27 (approving EPIC's application); SER42 (making "no recommendation as to the proposal submitted by EPIC"). Further, the court ordered that the Net Settlement Fund be "divided equally" among the recipients, rather than in varied amounts, as proposed by Plaintiffs. ER27 & n.12. In short, it is clear that the selection process did not bend to Google's "whims." *Nachshin*, 663 F.3d at 1039.

**B.      Google Had No Disqualifying Relationship With Any Of The *Cy Pres* Recipients**

Eschewing reliance on Ninth Circuit precedent that validates the awards here, Lowery urges the Court to adopt a new test suggested by the American Law Institute. *See* Br. 3 (asserting that "the district court err[ed] as a matter of law when it failed to apply [*ALI Principles*] § 3.07"); Br. 44 (asserting that "[t]he correct legal standard" is "*ALI Principles* § 3.07 *comment (b)*"). The ALI believes that a "*cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* § 3.07 *comment (b)*. There is no basis for this Court to adopt this new test—which conflicts with this Court's binding decision in *Lane*. But even if Lowery's preferred test were adopted, it would be satisfied: Google's alleged prior affiliations with the *cy pres* recipients

are not "significant" and do not "raise substantial questions about whether the award was made on the merits." *Id.*

In *Lane*, this Court explained that the law does *not* require "that settling parties select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process." 696 F.3d at 821. Instead, the Court adopted a permissive test: "a district court should not approve a *cy pres* distribution unless it bears a ***substantial nexus*** to the interests of the class members." *Id.* (emphasis added). Applying that requirement, *Lane* approved a *cy pres* distribution to an organization that had one of the defendant's employees on its board of directors. 696 F.3d at 821. As the Court explained, the fact that "Facebook retained and will use its say in how *cy pres* funds will be distributed so as to ensure that the funds will not be used in a way that harms Facebook is the unremarkable result of the parties' give-and-take negotiations, and the district court properly declined to undermine those negotiations by second-guessing the parties' decision as part of its fairness review over the settlement agreement." *Id.* at 821–22.

*Lane* is binding, and Lowery admits that his proposed test would conflict with it—at least "in the case of [affiliations with] a defendant." Br. 16. That alone is reason to reject Lowery's argument. There is no dispute that the *cy pres* recipients chosen by the District Court meet the test adopted in *Lane*. Indeed, this is a much

easier case. In contrast to the settlement in *Lane*, the Agreement here expressly provides that Google may not "exercise any control or influence over any Approved *Cy pres* Recipient's expenditure of the *cy pres* funds." ER187, ER189.

While the Court need go no further, the settlement here readily meets Lowery's preferred standard. Lowery does not dispute the District Court's finding that all of the *cy pres* recipients are "independent organizations with a track record of addressing consumer privacy concerns." ER27. Nor could he. It is also undisputed that most of those recipients have never received any money from Google and have no "affiliation"—"significant" or otherwise—with Google. *See* Br. 7, 25.

Indeed, many of the recipients—including those that Lowery complains of—have criticized Google.[4] For example, Lowery objects that Google has a prior affiliation with World Privacy Forum. But World Privacy Forum has "publicly criticized Google's lack of transparency regarding its privacy policies" and "played

---

[4] *E.g.*, Shiva Stella, *Public Knowledge Urges DOJ to Scrutinize Google's Digital Advertising Practices for Antitrust Violations*, Public Knowledge (May 18, 2020), https://www.publicknowledge.org/press-release/public-knowledge-urges-doj-to-scrutinizegoogles-digital-advertising-practices-for-antitrust-violations/; *Comments of the World Privacy Forum to the Federal Trade Commission Regarding Competition and Consumer Protection in the 21st Century Hearings*, Project Number P181201 (Aug. 20, 2018) https://www.ftc.gov/system/files/documents/public_comments/2018/08/ftc-2018-0048-d-0130-155142.pdf (criticizing Google's disclosures of its collection of geolocation information); ACLU, *Nationwide Coalition of Over 85 Groups Urges Companies Commit Not to Provide Face Surveillance to the Government* (Jan. 15, 2019), https://www.aclu.org/press-releases/pressure-mounts-amazon-microsoft-and-google-against-selling-facial-recognition.

a key role in the $17 million fine Google paid to the Federal Trade Commission for circumventing user's privacy choices in Apple's Safari Internet browser." *Referrer Header*, 869 F.3d at 745 n.7. EPIC, another of the *cy pres* recipients, filed an amicus brief against Google in an earlier phase *of this case*. *See* Brief of Amicus Curiae EPIC in support of Appellees, *Benjamin Joffe, et al. v. Google, Inc.*, No. 11-17483 (March 30, 2012). EPIC also submitted an amicus brief in support of Lowery's counsel (and against Google) in *Frank v. Gaos*. Brief of Amicus Curiae EPIC, *Frank v. Gaos*, No. 17-961 (U.S. July 16, 2018). Any claim that Google is directing *cy pres* funds to favored charities (*see* Br. 24) is frankly absurd.

That "four of the nine *cy pres* recipients—Public Knowledge, World Privacy Forum, ACLU, and EPIC—previously received Google *cy pres* money" (Br. 7)[5] does not "impugn the settlement" (*Referrer Header*, 869 F.3d at 745). Nor is it problematic that "Google has previously dona[ted] to several of the recipients" (Br. 25)—in fact, fewer than half of them in the last decade (SER82). As an initial matter, Lowery ignores the Settlement Agreement's provision that "the Settlement Amount is in addition to Google's charitable donations," i.e., that the *cy pres* awards are in addition to, and not a substitute for, any other charitable contributions that Google might make—whether to the selected recipients or any other non-profits. ER187.

---

[5] Lowery asserts that Public Knowledge has "previously received Google *cy pres* money." Br. 7. But the record contains no evidence for that assertion and, as far as Google is aware, it is not accurate.

Given that, Lowery has absolutely no basis—and certainly no evidence—for his bald claim that "Google agreed to pay money to institutions that it was in all likelihood going to pay anyway." Br. 46.

In any event, Google's past contributions to a handful of the recipients can hardly "raise substantial questions about whether the award was made on the merits." It was Plaintiffs—not Google—who proposed these recipients, and it was the district court—not Google—who actually selected them. Google had nothing to do with either part of the process, and the happenstance of its prior contributions is just that—it has no meaningful effect on the integrity or propriety of the *cy pres* distributions. That is especially so where, as here, the organizations that were selected submitted detailed explanations of how they will use the *cy pres* funds to benefit the class and can demonstrate that they are able to use awarded funds independently and follow through on their plan.

Indeed, the *cy pres* recipients here are among the "most effective advocates for internet privacy in the country," with a long track record of following through on proposals and remaining independent of donors. ER24. "Given the burgeoning importance of Internet privacy, it is no surprise that Google has chosen to support the programs and research of recognized academic institutes and nonprofit organizations." *Referrer Header*, 869 F.3d at 745. Simply put, as the district court

found, "earlier donations" do not undermine "the selection process employed to vet the *cy pres* recipients." *Id.*

Moreover, a *per se* exclusion of organizations that previously received funds from the parties would have perverse effects. As this Court has explained, in "emerging areas such as Internet and data privacy," there are a limited number of organizations with the kind of "substantial record of service" that "inspires confidence that the recipient will use the funds to the benefit of class members." *Referrer Header*, 869 F.3d at 745–46. And given that "over time, major players such as Google may be involved in more than one *cy pres* settlement, it is not an abuse of discretion for a court to bless a strong nexus between the *cy pres* recipient and the interests of the class over a desire to diversify the pick via novel beneficiaries that are less relevant or less qualified." *Id.* at 746; *accord Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 946 n.8 (N.D. Cal. 2013) ("The mere receipt of some other funding from [the defendant] does not give rise to a reasonable doubt that the organization lacks sufficient independence to serve as a suitable recipient of *cy pres* funds.").

Finally, as part of his broadside attack on *cy pres* settlements, Lowery lodges a number of unsupported allegations having no bearing on this settlement. Lowery complains, for example, that the Electronic Frontier Foundation is "often an ally of Google," but EFF is not a *cy pres* recipient here. Br. 24. Lowery also accuses Google of "using its funding decisions to influence the research and advocacy of nonprofits"

(Br. 24), but that inflammatory allegation has no basis in the record and no relevance here, where Google had no role here in selecting *cy pres* recipients (ER188–189; SER81) and expressly agreed that it would exercise no control over any expenditure of *cy pres* funds (ER189).

In sum, the district court's approval of reputable *cy pres* recipients that Google has no significant prior relationship with—and had nothing to do with selecting— provides no basis for invalidating the Settlement Agreement.

## III. THE SETTLEMENT AGREEMENT PROVIDES MEANINGFUL INJUNCTIVE RELIEF TO THE CLASS

Finally, despite what Lowery claims as the premise of much of his argument, this case does *not* involve a "*cy pres*-only settlement." Br. 17; *see also Amici* Br. 3. In addition to the $13 million Settlement Fund proposed to be distributed to *cy pres* recipients, the Settlement Agreement provides for "meaningful" injunctive relief for the class, by among other things extending the duration of Google's obligations under the AVC and requiring Google to take additional steps to inform and educate consumers about privacy and Wi-Fi security. ER26. The presence of this meaningful injunctive relief confirms that the Settlement Agreement is far from a "gimmick[]" designed to benefit the parties or counsel at the class's expense. Br. 20. The district court's factual finding that the injunctive relief provided meaningful benefits to the class is anything but "clearly erroneous." *Campbell*, 951 F.3d at 1123.

The Settlement Agreement provides for significant injunctive relief that extends for five years after Final Approval. ER189–190. Through the Agreement's injunctive provisions, Google is required to: (1) destroy all of the acquired payload data; (2) agree to not use Street View vehicles to collect and store payload data for use in any product or service, except with notice and consent; (3) comply with all aspects of the Privacy Program described in the relevant portions of the AVC; and (4) host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instructions on how to remove a wireless network from inclusion in Google's location services. *Id.*

Lowery complains that this injunctive relief "merely duplicate[s]" prior relief obtained by a coalition of state attorneys general in connection with their investigation of the same activities at issue in this case. Br. 10. That is neither legally relevant nor factually accurate. As to the law, *Campbell*—which the district court cited (ER26), but Lowery ignores—held that it was "valu[able]" injunctive relief to require Facebook to display for "a year" a "twenty-two-word Help Center disclosure" even though Facebook "had already made" a similar disclosure elsewhere. 951 F.3d at 1123 & n.12. Thus, as a matter of law, the fact that the injunctive obligations in a settlement agreement might be similar to those the

47

defendant had already undertaken does not make the agreement improper or valueless.

As to the facts, the Settlement Agreement goes far beyond what the AVC required. First, the Agreement extends by at least two years Google's obligations to maintain the privacy programs described in the AVC. ER189–190. The AVC's privacy programs last until 2023 (*see* ER172), whereas the Agreement requires those programs to continue for five years after the Agreement is final, *i.e.*, late 2025 at the earliest (ER190). Even if the Settlement Agreement does not require changes to those programs, it nevertheless imposes on Google a binding legal obligation, over which the district court "maintains jurisdiction," to continue those programs for a significantly longer period of time than required by the AVC. ER26. The district court did not "clearly err" in concluding that this was meaningful injunctive relief. *Campbell*, 951 F.3d at 1123 n.12.

In addition, the Settlement Agreement expands Google's obligations to host and maintain educational webpages to inform users about Wi-Fi security. ER189–190. Even "a year-long requirement to make such a disclosure has value." *Campbell*, 951 F.3d at 1123. Such educational disclosures "provide[] information to users" about Wi-Fi security, "making it less likely that users will unwittingly divulge private information." *Id.* While the AVC had a similar provision, the Settlement Agreement required Google to provide additional information, and because of that

Agreement, Google has already significantly revised and expanded its educational webpages to make them clearer, more detailed, and better able to inform the public about how to protect their home Wi-Fi networks and opt-out of certain location-based services. ER55; *see also* SER2–3 (identifying the educational webpages created by Google). That too is meaningful relief that benefits all class members. Indeed, Lowery does not dispute the district court's finding that the injunctive relief "reduc[es] the chance that similar invasions of the class's privacy recur, and help[s] Class Members protect against future privacy violations." ER15.

More broadly, the fact that much of the injunctive relief secured by the Settlement Agreement tracks the relief sought and obtained by the state Attorneys General is hardly surprising or problematic. As the district court remarked, "we don't start in a vacuum." ER39. "We start where we are today," after "a decade of litigation" and after "a number of actions taken by various entities." ER39–40. Google settled with the States in 2013—more than five years before this case was resolved. It is no surprise that the state Attorneys General pressed for and secured in the AVC the most obvious and important forms of injunctive relief that could be obtained from Google. By the time this case settled, nearly a decade after the data collections at issue had ceased, there was little more to be done. But it would be perverse to use that prior agreement as a basis for invalidating the one obtained here. To the contrary, the fact that the Settlement Agreement builds on the injunctive relief

obtained by the state Attorneys General only confirms that it is the best relief possible. And by extending and expanding that relief, the Settlement Agreement binds Google in ways that the AVC does not and provides additional meaningful benefits to the class.

Finally, Lowery complains that "[o]pt-outs get all the benefits" of the injunctive relief too, but that is not unusual. Br. 38. The same was true in *Lane*, where there was a *cy pres* monetary award and an injunction to cease certain conduct (696 F.3d at 817), and *Campbell*, where the relief was a disclosure on a publicly available webpage (951 F.3d at 1123), and many other cases. Lowery cites no authority supporting the invalidation of a class settlement agreement on this basis, and he does not even try to identify what alternative injunctive relief here would not have benefitted opt-outs. In any event, the fact that even those who do not wish to be bound by the settlement might receive some benefit from it is hardly a reason to invalidate that agreement or conclude that it is unfair or inequitable.

## CONCLUSION

For these reasons, this Court should affirm the judgment of the district court granting final approval of the parties' class Settlement Agreement.

Dated: October 13, 2020     Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: /s/ *Brian M. Willen*
    Brian M. Willen
    Eli B. Richlin
    WILSON SONSINI GOODRICH & ROSATI,
    Professional Corporation
    1301 Avenue of the Americas
    40th Floor
    New York, NY 10019
    Tel: (212) 999-5800
    Fax: (212) 999-5899
    bwillen@wsgr.com
    erichlin@wsgr.com

    David H. Kramer
    WILSON SONSINI GOODRICH & ROSATI,
    Professional Corporation
    650 Page Mill Road,
    Palo Alto, CA 94304
    Tel: (650) 493-9300
    Fax: (650) 493-6811
    dkramer@wsgr.com

    Paul N. Harold
    WILSON SONSINI GOODRICH & ROSATI,
    Professional Corporation
    1700 K Street, NW, Fifth Floor
    Washington, D.C., 20006-3817
    Tel: (202) 973-8800
    Fax: (202) 973-8899
    pharold@wsgr.com

*Attorneys for Defendant-Appellee* Google LLC

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendant-Appellee respectfully states that there are no related cases.

Dated: October 13, 2020   Respectfully submitted,

           WILSON SONSINI GOODRICH & ROSATI
           Professional Corporation

           By: /s/ *Brian M. Willen*
             Brian M. Willen

           *Attorney for Defendant-Appellee*
           Google LLC

# CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,335 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: October 13, 2020                         By: */s/ Brian M. Willen*
                                                         Brian M. Willen

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 13, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: October 13, 2020                    By: */s/ Brian M. Willen*
                                                 Brian M. Willen