No. 20-15616

*In the*

# United States Court Of Appeals
*For the*
# Ninth Circuit

---

IN RE: GOOGLE, LLC STREET VIEW ELECTRONIC
COMMUNICATIONS LITIGATION

BENJAMIN JOFFE, *et al.*,
*Plaintiff-Appellees*,

DAVID LOWERY,
*Objector-Lowery,*

v.

GOOGLE LLC,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of California, San Francisco Division,
No. 3:10-cv-2184-CRB, Hon. Charles R. Breyer

---

## PLAINTIFF-APPELLEES' ANSWERING BRIEF

---

Daniel A. Small
Robert W. Cobbs
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
rcobbs@cohenmilstein.com

Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
jkodroff@srkattorneys.com
jmacoretta@srkattorneys.com
mgeppert@srkattorneys.com

Elizabeth J. Cabraser
Michael W. Sobol
Melissa Gardner
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com
msobol@lchb.com
mgardner@lchb.com

*Attorneys for Plaintiff-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................... 1

ISSUES PRESENTED ........................................................................... 3

STATEMENT OF THE CASE ................................................................ 5

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT ....................................................................................... 15

I.    Abuse of Discretion is the Standard of Review for Settlement
      Approvals and Class Certification ................................................ 15

II.   The District Court Was Correct in Finding the Settlement Fund Non-
      Distributable ................................................................................ 17

      A.    Class Members Cannot Be Identified Effectively and
            Efficiently ........................................................................... 19

            1.    Service Awards are Not "Evidence" the Fund is
                  Distributable ............................................................... 22

            2.    The Plan of Distribution is Fair and Reasonable ..................... 23

      B.    Even if a Claims Process were Possible, the Settlement Fund
            Could Provide Only *De Minimis* Payments to Each Class
            Member ................................................................................ 25

III.  A Bright-Line Rule That *Cy Pres* Settlements Are *Never* Appropriate
      When *Some* Class Members Can Receive a Distribution Is Not the
      Law, Nor Should It Be .................................................................. 27

      A.    Other Circuits Also Permit *Cy Pres* Settlements When Funds
            Are Non-Distributable .......................................................... 28

      B.    The Court Should Reject Lowery's New Bright-Line Rule
            Effectively Prohibiting *Cy Pres* .......................................... 32

            1.    *Cy Pres* Funding Can Deliver Real Benefits to the
                  Class as a Whole When Direct Payments Cannot ......... 34

            2.    Lowery's Proposal Is Inequitable to Class
                  Members Who Cannot File Claims ............................... 36

3.      The Solution to *Cy Pres* Abuse Is Judicial Oversight, Not a Blanket Prohibition on *Cy Pres* Settlements ................................................................. 39

IV.    The District Court was Correct to Certify the Class and Appoint Class Counsel ................................................................................ 40

    A.     The Class and Class Counsel Satisfy Rule 23 .................................... 42

    B.     A *Cy Pres* Distribution Does Not Undermine the Superiority of Aggregate Litigation for This Class .................................... 45

V.     The District Court was Within its Discretion to Approve the Proposed *Cy Pres* Recipients .......................................................... 46

VI.    The Settlement Does No Injury to Lowery's First Amendment Rights ....... 49

VII.   The District Court's Attorneys' Fee Award Was Proper ............................. 53

CONCLUSION ................................................................................ 56

CERTIFICATE OF COMPLIANCE .................................................... 58

CERTIFICATE OF SERVICE ............................................................ 59

ADDENDUM ................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alfred A. Knopf, Inc. v. Colby*,
509 F.2d 1362 (4th Cir. 1975) ...................................................................50

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) ..................................................................36

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000)...................................................................................53

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ................................................. 14, 41, 45, 46

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) ..................................................................54

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)...................................................................................52

*Davis v. Prudential Secs., Inc.*,
59 F.3d 1186 (11th Cir. 1995) ..................................................................50

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*,
84 F.3d 451 (D.C. Cir. 1996).....................................................................30

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
673 F.3d 192 (3rd Cir. 2012).....................................................................50

*Dennis v. Kellogg Co.*,
697 F.3d 858 (9th Cir. 2012) ............................................................. 29, 40

*Doninger v. Pac. N.W. Bell, Inc.*,
564 F.2d 1304 (9th Cir. 1977) ......................................................... 16, 40, 44

*Duffield v. Robertson Stephens & Co.*,
144 F.3d 1182 (9th Cir. 1998) ..................................................................50

*Durning v. Citibank, N.A.*,
950 F.2d 1419 (9th Cir. 1991) .....................................................................3

*Edwards v. Habib*,
397 F.2d 687 (D.C. Cir. 1968).....................................................................51

*EEOC v. Luce, Forward, Hamilton & Scripps*,
   345 F.3d 742 (9th Cir. 2003) .......................................................................50

*Everett v. Paul Davis Restoration, Inc.*,
   771 F.3d 380 (7th Cir. 2014) ................................................................. 50, 51

*Fraley v. Facebook, Inc.*,
   966 F. Supp. 2d 939, 943 (N.D. Cal. 2013), *aff'd*
   638 F. App'x 594 (9th Cir. 2016)..................................................................24

*Fraley v. Facebook, Inc.*,
   No. 11-01726, 2012 WL 6013427 (N.D. Cal. Dec. 3, 2012) ........................21

*Frank v. Gaos*,
   139 S. Ct. 1041 (2019)..................................................................................41

*Google Referrer*, 869 F.3d at 742 (9th Cir. 2017) .............................................. 3, 11

*Harris v. Quinn*,
   573 U.S. 616 (2014)......................................................................................52

*Hughes v. Kore of Indiana Enter.*,
   731 F.3d 672 (7th Cir. 2013) ................................................................. 35, 45

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) ................................................... 29, 30, 31, 55

*In re BankAmerica Corp. Secs. Litig.*,
   775 F.3d 1060 (8th Cir. 2015) .............................................................. 29, 32

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ......................................................... 16, 40, 53

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
   No. 12-md-02330, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ...............21

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012).........................................................55

*In re Hotel Telephone Charges*,
   500 F.2d 86 (9th Cir. 1974) ..........................................................................44

*In re Lupron Mktg. and Sales Practices Litig.*,
   677 F.3d 21 (1st Cir. 2012)...........................................................................30

*In re Netflix Privacy Litig.,* No. 11-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................................................................................................26

*In re Pharm. Indus. Average Wholesale Price Litig.,*
588 F.3d 24 (1st Cir. 2009) ............................................................29

*In re: Google Inc. Cookie Placement Consumer Priv. Litig.,*
934 F.3d 316 (3d Cir. 2019) ................................................. 29, 31

*In re: Motor Fuel Temp. Sales Practice Litig.,*
872 F.3d 1094 (10th Cir. 2017) ....................................................50

*Ira Holtzman, C.P.A. v. Turza,*
728 F.3d 682 (7th Cir. 2013) ................................................. 29, 31

*Janus v. AFSCME, Council 31,*
138 S. Ct. 2448 (2018)..................................................................52

*Joffe v. Google, Inc.,*
746 F.3d 920 (9th Cir. 2013) ...........................................................5

*Johanns v. Livestock Mktg. Ass'n,*
544 U.S. 550 (2005).......................................................................53

*Keepseagle v. Vilsack,*
307 F.R.D. 233 (D.D.C. 2014) .....................................................38

*Klier v. Elf Atochem N. Am., Inc.,*
658 F.3d 468 (5th Cir. 2011) ...................................... 29, 30, 31, 37

*Knapp v. Art.com, Inc.,*
283 F. Supp. 3d 823 (N.D. Cal. 2017).........................................48

*Knox v. SEIU, Local 1000,*
567 U.S. 298 (2012).......................................................................52

*Lane v. Facebook, Inc.,*
696 F.3d 811 (9th Cir. 2012) ............................................... passim

*Masters v. Wilhelmina Model Agency, Inc.,*
473 F.3d 423 (2d Cir. 2007) ......................................... 29, 30, 34

*Mission Linen Supply v. City of Visalia,*
817 F. App'x 336 (9th Cir. 2020) .................................................48

*Molski v. Gleich,*
  318 F.3d 937 (9th Cir. 2003) ................................................. 17, 25

*Nachshin v. AOL, LLC,*
  663 F.3d 1034 (9th Cir. 2011) ............................................. passim

*New York Times v. Sullivan,*
  376 U.S. 254 (1964) ................................................................51

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ................................................................51

*Pearson v. NBTY, Inc.,*
  772 F.3d 778 (7th Cir. 2014) ..................................... 29, 31, 32, 55

*Perkins v. LinkedIn Corp.,*
  No. 13-04303, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016) .......................53

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) ................................................................52

*Powell v. Georgia-Pacific Corp.,*
  119 F.3d 703 (8th Cir. 1997) .......................................................31

*Prager Univ. v. Google LLC,*
  951 F.3d 991 (9th Cir. 2020) ......................................................49

*Rodriguez v. W. Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009) ................................................. 22, 36

*Roes, 1-2 v. SFBSC Mgmt., LLC,*
  944 F.3d 1035 (9th Cir. 2019) ......................................... 18, 22, 37

*Rosenbloom v. Pyott,*
  765 F.3d 1137 (9th Cir. 2014) ......................................................3

*Shelley v. Kraemer,*
  334 U.S. 1 (1948) ....................................................................51

*Six (6) Mexican Workers v. Ariz. Citrus Growers,*
  904 F.2d 1301 (9th Cir. 1990) ............................................. passim

*United Egg Producers v. Standard Brands, Inc.,*
  44 F.3d 940 (11th Cir. 1995) ................................................. 50, 51

*Youssofi v. Credit One Fin.*,
    717 F. App'x 745 (9th Cir. 2018)................................................................52

**Statutes**

18 U.S.C. § 2511(2)(g)(i)............................................................................5

18 U.S.C. §§ 2510 *et seq.*..........................................................................5

18 USC § 2510(16) ....................................................................................5

**Rules**

Fed. R. Civ. P. 23 ............................................................................ passim

**Treatises**

Principles of the Law of Aggregate Litig. § 3.07 (Am. L. Inst. 2010)....... 29, 46, 47

William B. Rubenstein,
    *4 Newberg on Class Actions* (5th ed. 2019 update)

    § 9:39 ....................................................................................52

    § 12:30 ..................................................................................38

    § 12:32 ............................................................................ 35, 43

**Other Authorities**

Brief of Prof. William B. Rubenstein as Amicus Curiae (No. 17-961),
    2018 WL 4293386 ..............................................................................38

**INTRODUCTION**

Appellees (Plaintiffs below) respectfully urge this Court to affirm the judgment of the District Court approving a class action settlement that will provide real benefits to the class via a *cy pres* distribution. The District Court's approval of the settlement was squarely within its discretion, informed by nearly a decade of oversight and issued after a close examination of the record and detailed findings concluding that the distribution of settlement funds to class members would be infeasible.

This case arose when Defendant Google, LLC was revealed to have used its "Street View" mapping cars driving through residential neighborhoods as covert data collection vehicles, capturing transmissions from Wi-Fi networks in the homes they passed. The parties spent three years of intensive discovery and analysis, under the supervision of a court-appointed Special Master, trying to determine whether the billions of frames of purloined data included Plaintiffs' communications. For reasons explained by the District Court in its settlement approval decision and discussed below, repeating that process for others in the approximately 60 million-member class would be infeasible, and utterly disproportional, in terms of time, cost and result. Identifying class members for cash distributions is, as the District Court correctly found, a practical impossibility and prohibitively expensive, as it would require, *inter alia*, access to information

about wireless networks as they existed in 2007-2010, and technical searches of the Street View data that proved cumbersome with respect to the named Plaintiffs. These facts required the parties to explore, negotiate, and ultimately propose a settlement that resolved the claims and protected the interests of the class through *cy pres* awards to organizations committed to using the funds for the protection of internet privacy, as this Court and other Circuits have recognized as proper.

The District Court was soundly within its discretion when it determined that *cy pres* awards are the "next best" use of the settlement's $13 million common fund. A *cy pres* class settlement, in this case, is the best application of Rule 23(e) to fulfill Rule 1's objective: "to secure the just, speedy, and inexpensive determination" of this action. The *cy pres* distributions will benefit class members through the work of non-profit entities—"some of the most effective advocates for internet privacy in the country," ER28—in promoting the interests and objectives that the class has pursued under the Electronic Communications Privacy Act. And, without any affordable and effective means to get the settlement funds to the class members directly, the District Court soundly concluded that the best way to effectuate the ECPA's deterrence goal was to permit a *cy pres* distribution to ensure that Google did not retain the settlement funds.

Objector David Lowery seeks an end to *cy pres* on the basis of ideological arguments divorced from the factual record the District Court faced. With

arguments his counsel reprises from those he made, and which this Court firmly rejected, in *In re Google Referrer Header Litigation*,[1] Lowery would strip the District Court of the discretion to permit a *cy pres* distribution when a full and unambiguous record demonstrates that there is no viable and fair alternative available. Lowery would have this Court mandate that district courts always require—regardless of the circumstances—that the overwhelming majority of the class transfer their share of the settlement fund to a tiny sliver of the class, though such a holding would violate the very theory on which his argument rests—that settlement funds belong *pro rata* to each member of the class.

The District Court's approval should be affirmed.

## ISSUES PRESENTED

1.    Did the District Court act within its broad discretion in finding, after a decade overseeing the case and overseeing the Special Master's three-year examination of the intercepted data, that the settlement fund could not be distributed to the class, where class members cannot self-identify, where searching for identifying information in the intercepted data would be unusually difficult,

---

[1] 869 F.3d 737, 742 (9th Cir. 2017) (vacated on other grounds). Lowery argues the district court erred "to the extent it relied upon [*Google Referrer*] to divine Ninth Circuit views." Lowery Opening Brief ("Br.") at 18, Dkt. 17. Though *Google Referrer* was vacated on standing grounds and is thus not binding precedent, *see Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991), its reasoning is nonetheless of substantial persuasive value, and the opinion represents the considered views of this Court, *see Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014).

expensive, and ineffective, and where the size of the class in relation to the common fund (the adequacy of which is not disputed) would result in individual payments far smaller than the cost of distributing them?

2.      Did the District Court act within its discretion when, after determining the settlement fund was non-distributable, it determined that a *cy pres* distribution was fair, reasonable, and adequate, consistent with Ninth Circuit precedent (*Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012))?

3.      Did the District Court act within its discretion in finding that a class action was superior to other methods of adjudicating this controversy, where individual suits would be difficult or impossible for most class members because of the amount in controversy and the difficulty and cost of determining whether they were victims of Google's conduct?

4.      Is federal court approval of *cy pres* awards as part of a settlement between private parties outside the scope of the First Amendment because there is no state action and, given the opportunity of class members to opt out of the settlement, there is no compelled speech?

5.      Did the District Court appropriately exercise its discretion in approving attorneys' fees totaling 25% of the net settlement fund, where the court found that the settlement fund and injunctive relief benefitted the class, that the

case was prosecuted with skill and expertise, that the attorneys undertook considerable risk, and the award resulted in a negative lodestar multiplier of 0.55?

## STATEMENT OF THE CASE

The judgment under review resolves nearly a decade of litigation against Defendant Google, LLC under the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 *et seq.* ("ECPA"). Plaintiffs allege that between 2007 and 2010, Google used equipment on the vehicles that photograph streets and buildings for the "Street View" functionality in Google's map services intentionally to intercept and store data from the electronic communications transmitted by class members over in-home unencrypted Wi-Fi networks. ER7; Dkt. 54, ¶¶1-4. [2]

Plaintiffs' federal claims survived a motion to dismiss and an interlocutory appeal. *Joffe v. Google, Inc.*, 746 F.3d 920 (9th Cir. 2013). In that appeal, this Court held for the first time that data transmitted over unencrypted Wi-Fi networks is not an unencrypted "radio communication," 18 USC § 2510(16), exempt from ECPA under 18 U.S.C. § 2511(2)(g)(i), and that interception, storage, and or use of such secretly intercepted data could violate the ECPA. *Id.* at 936. The case

---

[2] Lowery's Excerpts of Record (Dkt. 18) includes page numbers corresponding to the excerpts only in portions of Volume II, such that only "ER31-35" and "ER82-178" are designated as such. Accordingly, for ease of reference, citations to "ER" throughout this brief are to the page number applied to the consolidated PDF's upper right-hand corner when it is downloaded from Pacer, such that "ER1" herein would refer to Page 1 of 241 of Lowery's Excerpts of Record. References to "SER" in this brief are to Plaintiff-Appellees' Supplemental Excerpts of Record.

proceeded with discovery devoted to the issue of the named plaintiffs' standing. ER9; Dkt. 108. The Court appointed a Special Master to take custody of, and conduct complex technical searches on, the data collected by the Street View cars to determine whether any named plaintiff's communications were acquired as alleged. ER9. Plaintiffs produced information about themselves and their wireless network equipment (including MAC addresses, email addresses, and SSIDs during 2007-2010) to the Special Master for this analysis. *Id.* The Special Master loaded three *billion* frames of raw data, roughly 300 million of which contained "Payload Data"—the kind of data that could contain the contents of communications. *Id.* The Special Master searched this data for the information provided by the Plaintiffs, for evidence that Payload Data had been captured. Jurisdictional discovery, including selecting the Special Master, organizing the intercepted data into a searchable database, obtaining searchable information from the named Plaintiffs, resolving disputes between the parties regarding the searches to be performed, running the searches, and the Special Master reporting to the Court, took nearly three years of work. *Id.* The Special Master's report was filed in December 2017. Informed by this extensive discovery process, with the help of a skilled mediator, the parties negotiated for approximately four months and executed a settlement on June 11, 2018. ER188-209; SER8-9.

The Settlement Agreement provides for a single Settlement Class, defined as follows:

> "Class" means all persons who used a wireless network device from which Acquired Payload Data was obtained.
>
> "Acquired Payload Data" means the Payload Data acquired from unencrypted wireless networks by Google's Street View vehicles operating in the United States from January 1, 2007 through May 15, 2010.

ER191-192, ¶¶2, 5. Notably, determining whether a given person falls within the class requires both information from that person, such as information about their Wi-Fi network in 2007-2010, *and* the database of intercepted data, so that the database can be searched for a communication from that network containing Payload Data. As evidenced by the three years of work performed by the Special Master for eighteen named plaintiffs, this process is "unusually difficult and expensive." ER25.

Under the settlement agreement, Google paid $13 million into a settlement fund which (after payment of attorneys' fees, service awards, notice and settlement administration costs, and reimbursement of litigation expenses) will fund Court-approved *cy pres* awards to "independent organizations with a track record of addressing consumer privacy concerns," who will use the awards "to promote the protection of Internet privacy." ER31; *see also* ER194-196, ¶29; *id.*, ¶¶16, 21, 24. Plaintiffs proposed *cy pres* recipients for the District Court's consideration, but the

District Court was the decisionmaker; it chose the *cy pres* recipients and the amounts they will receive. ER193, ¶11; ER196, ¶29; ER31. None of the settlement fund will revert to Google. ER201, ¶53. As part of the settlement, Google represents that the funds distributed to *cy pres* recipients are in addition to its charitable giving and would not have been expended otherwise. ER195, ¶25. Google did not select any potential *cy pres* recipient proposed to the District Court. Pursuant to the settlement, Plaintiffs disclosed to Google the list of potential recipients they intended to propose, but no changes to the list were made in response to Google's views. ER196, ¶29; SER10, ¶24.

The *cy pres* recipients include "some of the most effective advocates for internet privacy in the country," ER28, who each submitted detailed proposals that were publicized as part of the notice program: the ACLU Foundation, the Center for Digital Democracy, the Center on Privacy & Technology at Georgetown Law, Consumer Reports, MIT's Internet Policy Research Initiative, Public Knowledge, the Rose Foundation, and the World Privacy Forum. SER36-121. The Electronic Privacy Information Center ("EPIC"), another preeminent internet privacy group, submitted a proposal independently of Plaintiffs that was approved by the court for *cy pres* funding. SER27-35. The proposals cover diverse approaches to internet privacy, including advocacy, education, and litigation. SER27-121. The District

Court found the awards "would increase the funding for their work and likely yield actual improvements to internet privacy." ER28.

The settlement also includes injunctive relief. To protect class members, the settlement requires Google to destroy Acquired Payload Data within 45 days (subject to any preservation obligations to any class member opt outs). ER197, ¶33. Google will "not collect and store for use in any product or service Payload Data via Street View vehicles, except with notice and consent," and will comply with the privacy program and other requirements of the Assurance of Voluntary Compliance ("AVC") Google entered in 2013 with various state Attorneys General regarding its Street View vehicles. ER197, ¶¶34-35. The settlement brings Google's compliance with the AVC within the District Court's jurisdiction, and extends the AVC by at least two years. *See* ER30; ER179-180. Google will "host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network." ER197-98, ¶¶36-37. This measure will help class members avoid the vulnerability of an unencrypted Wi-Fi network—the vulnerability at issue in this case.

Shortly after the settlement was reached, the Court stayed proceedings until the Supreme Court issued an opinion in *Frank v. Gaos*, 139 S. Ct. 1041 (2019). ER9. *Gaos* was decided on March 20, 2019, and on October 9, 2019, the District

Court granted preliminary approval to the settlement. Dkt. 178; SER10. Notice to the class yielded only two objections and one exclusion. ER32.

After a hearing in which Lowery's counsel participated, the District Court granted final approval to the settlement. ER7. The District Court made specific findings of fact that the settlement class met all requirements for certification under Rule 23(a) and (b)(3), and that the settlement was fair, reasonable, and adequate under Rule 23(e)(2). In particular, the District Court found that "it is unusually difficult and expensive to identify class members in this case," and found that this supported a finding of non-distributability. ER25; *see* ER24-27. The District Court also found that the settlement fund was "non-distributable" under *Lane*, 696 F.3d at 819, because of the estimated 60-million person class size and the $13 million settlement fund, yielding a $0.22 amount per class member before payment of attorneys' fees and expenses. ER24-25.

The District Court considered and rejected Lowery's proposals for sending cash payments to class members, which included self-identification (on the assumption that less than 1% of the class would file claims) and a "lottery" system to distribute payment at random. ER27-29. The court explained that "the only way to make a claims process administratively feasible is to allow people to self-identify who cannot really know if they are able to self-identify." ER27. Moreover, even if a claims process were possible, it was "not necessarily desirable," in part

because Lowery's proposals would provide "no benefit to 99% of the class." *Id.*

"The *cy pres* award, on the other hand, is a reasonable alternative in light of the

infeasibility of making direct payments to every class member." *Id.*

The Court considered the proposals for *cy pres* funding submitted by

Plaintiffs and the independent proposal submitted by EPIC. The Court considered

the relationships, all of which had been disclosed, between the parties, including

their counsel, and the proposed recipients, including the ACLU Foundation (whose

affiliates have litigated with two class counsel firms), and found "no relationship

… that undermines the fairness of the Settlement to Class Members." ER31. The

court approved the proposed *cy pres* recipients, including EPIC, and changed

Plaintiffs' proposed allocation of *cy pres* funding, as explicitly permitted by the

Settlement Agreement. *Id.*

## SUMMARY OF THE ARGUMENT

The District Court's Final Approval Order should be affirmed. The Ninth

Circuit "has never imposed a categorical ban on a settlement that does not include

direct payments to class members." *Google Referrer*, 869 F.3d at 742. To the

contrary, district courts have discretion to approve a *cy pres* settlement when the

common fund is "non-distributable," *i.e.*, where "proof of individual claims would

be burdensome or distribution of damages costly. *Lane*, 696 F.3d at 819. In this

case, both circumstances make the fund non-distributable: claimants could not be

practically identified, and the settlement fund (though adequate) is simply too small to distribute more than *de minimis* payments broadly. *See Google Referrer*, 869 F.3d at 742.

District courts are required to evaluate the particular circumstances of each settlement to determine whether the proposed relief to the class is reasonable, including determining whether cash payments to class members are feasible. In this case, the district court was within its discretion in determining that cash payments to class members are not feasible, based upon a factual record informed by a multi-year investigation into the evidence of class membership—the data Google intercepted. Google cannot produce a class list from the data it captured from Wi-Fi networks. Class members cannot self-identify because they cannot know whether Google intercepted their private information when its Street View cars were photographing their locations. This renders any claim process expensive and largely ineffective. Any claims process would require either that claimants have retained obsolete hardware for more than a decade, or rely on non-unique identifying information that would cost many multiples of any award to verify. Very few class members will have access to their network hardware from ten or more years ago, and those few who do would have to be willing to submit claims without knowing whether they are class members. The District Court was correct

to conclude that this process would be "unusually difficult and expensive," at best. ER25.

This conclusion is bolstered by a key metric this Court has used to determine non-distributability. *Google Referrer* used each class member's *pro rata* share of the settlement fund to determine whether distributions were practicable; here, each class member's share is $0.22, a *de minimis* amount by any measure, even *before* accounting for the expense of claims verification and distribution.

Lowery does not confront the realities of class member identification, but asserts, without support, that settlement funds are "distributable" if *any* class members could be identified, no matter how few or at what cost. This is incorrect as a matter of law both in this Circuit and in others, but it is also incoherent as a matter of policy, leading to awful results for the absent class members Lowery purports to champion. When settlement funds cannot be distributed broadly across the class, *cy pres* is often the best way to distribute *actual benefit* to the *class as a whole*. Requiring courts to reject *cy pres* whenever payments can be made to *some* class members prevents counsel and the courts from achieving the best result for the class as a whole. *Cy pres* is also often a more equitable plan of distribution, as it delivers *indirect benefit* to class members on a more equal basis. Paying a small portion of the class, in contrast, donates most class members' shares, just like a *cy*

*pres* distribution does—but to other class members, rather than to charitable organizations that are bound to use it to class members' benefit.

The settlement fund is "non-distributable" under *Lane* and *Google Referrer*. The District Court was well within its discretion to approve a *cy pres* distribution under these circumstances.

*     *     *

In certifying the class for settlement, the District Court carefully followed Rule 23, making the required factual findings as to each prong. Lowery cannot show that these finding are clearly erroneous. Lowery's argument that a class action is not superior whenever settlement funds are non-distributable misunderstands this Court's reasoning in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and presumes, wrongly, that the class derives no benefit from the work funded by *cy pres*. The argument has also been flatly rejected by this Court in *Google Referrer*. In fact, as several courts have observed, non-distributable settlement funds are most common in cases where class actions are *most* superior to individual litigations—where small harms are broadly diffused.

No court has ever reversed approval of a *cy pres* settlement on First Amendment grounds, nor does any precedent even suggest that *cy pres* awards implicate First Amendment rights. *Cy pres* settlements are not compelled speech, first, because they are not state action; they are settlements of disputes between

-14-

private parties. A judge's determination that a settlement is fair and reasonable does not make the settlement governmental action. Second, Lowery's theory of compelled speech does not follow from his cases and leads to absurd results. Third, class members in Rule 23(b)(3) settlements like this one can opt out and are not compelled to endorse the speech of any *cy pres* recipient.

Finally, Lowery's attempt to undermine the District Court's fee decision again intrudes on the court's sound discretion. The settlement fund is a common fund, and the District Court's use of the percentage-of-recovery method is presumptively proper. The District Court valued the settlement at $13 million less expenses because the fund "benefits the class members by serving the goals of this litigation and the ECPA." ER19. Counsel also obtained injunctive relief that "works a benefit." *Id.* Lowery's argument is premised, once again, on the incorrect assumption that the value to class members obtained through *cy pres* funding is less real or important than cash payments, even when the settlement fund is unquestionably reasonable in amount and the fund's non-distributability stems from the difficulty of identifying class members and from the size of the class.

## ARGUMENT

## I.     Abuse of Discretion is the Standard of Review for Settlement Approvals and Class Certification

A district court's approval of a class action settlement and certification of a settlement class are reviewed for abuse of discretion. *In re Bluetooth Headset*

*Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011); *Doninger v. Pac. N.W. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977) ("The judgment of the trial court should be given the greatest respect and the broadest discretion, particularly if . . . he has canvassed the factual aspects of the litigation.") (citation omitted). "Such review is extremely limited" and the Court "will affirm if the district judge applies the proper legal standard and his findings of fact are not clearly erroneous." *Bluetooth*, 654 F.3d at 940 (quotations omitted). A proposed *cy pres* settlement distribution is reviewed under the same standard. *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Review of a settlement approval "is not predicated simply on whether there may be 'possible' alternatives; rather, we benchmark whether the district court discharged its obligation to assure that the settlement is 'fair, adequate, and free from collusion.'" *Google Referrer*, 869 F.3d at 742 (quoting *Lane*, 696 F.3d at 819).

Lowery is strategically vague about whether he argues the District Court applied the wrong legal standard or made clearly erroneous findings of fact. This is because the District Court's decision is rooted in key factual findings that Lowery cannot reasonable contest, including the non-distributability of the settlement fund due to the impracticality, arbitrariness, and unfairness of any claims process and the *de minimis* number of potential claims, and the benefit to the class delivered by the *cy pres* settlement. Instead he attempts to transmute his arguments into matters

of law. But no bright-line legal rules govern here; rather, Lowery proposes that this Court should adopt new rules of law undertaken by *no other* circuit court to remove from district courts' sound discretion these fact-bound, case-specific judgments. These judgments lie within the discretion of district courts for good reasons, and the Final Approval Order should be affirmed.

## II. The District Court Was Correct in Finding the Settlement Fund Non-Distributable

This Circuit, like many others, permits a *cy pres* distribution in circumstances where the settlement fund is "non-distributable," because "proof of individual claims would be burdensome or distribution of damages costly." [3] *Lane*, 696 F.3d at 819. The inquiry considers the practicability of identifying class members, verifying claims, and distributing cash payments. *See id.* at 821; *Nachshin*, 663 F.3d 1034; *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). Distributability is determined with respect to the class *as a whole*, and the Court has historically used each class member's *pro rata* share of the settlement fund as a key metric; if each class member's share would be *de minimis*, the fund is non-

---

[3] Lowery repeatedly uses the term "feasibility," following language used by other Circuits to refer to the applicable legal standard, though the primary Ninth Circuit cases use "non-distributable." *E.g.*, Br. 30. As discussed in § III.A, those standards are consistent with the *Lane* and *Nachshin* "non-distributability" standard and inconsistent with the term as used by Lowery. By mischaracterizing those courts' use of the word "feasible" to mean "feasible to pay *some* class members," Lowery seeks to alter binding Circuit precedent.

distributable. *Google Referrer*, 869 F.3d at 742; *Lane*, 696 F.3d at 821. Where the facts are such that direct payments are non-distributable, *cy pres* is fair and reasonable.

Lowery does not dispute that the $13 million common fund provides adequate monetary relief to the class as a whole. He does not dispute that approximately 60 million class members have valid claims to a *pro rata* payment from that fund. Nor does he contend that the District Court's calculation of $0.22 per class member, a clearly *de minimis* amount, was erroneous. Rather, he tries to distinguish this case from *Lane* and other Ninth Circuit authority by asserting, circularly, that this case is different simply *because* he contests the infeasibility of direct distributions. Br. 14, 18, 31.

The District Court correctly approved *cy pres* distributions as a reasonable (indeed, superior) result for this class based on a "searching," fact-based analysis of the reality of the case after ten years of litigation, substantial briefing, and an in-person hearing where Lowery presented his arguments. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019) (settlement approval requires a "searching inquiry"). The court's conclusion was based on two complementary factual findings: that "it is unusually difficult and expensive to identify class members," and that each class member's share of the settlement fund was a *de minimis* amount, providing only "$0.22 per class member even absent *any*

attorneys' fees, expenses, or even mailing costs." ER25. Each of these factors

supports a finding of non-distributability under Ninth Circuit precedent.

### A. Class Members Cannot Be Identified Effectively and Efficiently

As the District Court observed, this is "a case in which a vast but

nonetheless difficult-to-identify class of people suffered intangible injury, and

minimal damages." ER7. The District Court's findings that identification of class

members would be "unusually difficult and expensive," and "the only way to make

a claims process administratively feasible is to allow people to self-identify who

cannot really know if they are able to self-identify," was based on the record before

it. ER 25; ER27. Lowery's argument (Br. 28-34) that a distribution to this class

was "feasible," in contrast, relies on an obfuscation of the established legal

standard, facts from other, very different class settlements, and a Pollyanna-ish

approach to the process of verifying class members' claims. Lowery simply

*assumes* that, like individuals who would recall purchasing certain cooking oil,

class members can readily identify themselves as "persons who used a wireless

network device from which Acquired Payload Data was obtained." *See* ER192, ¶5.

They cannot. Lowery does not engage with the facts of this action and this

settlement, pointing instead to "evidence" of payments made to *other* classes

through claims administration processes tailored to the contexts of *other*

settlements.

Not every claims process is the same. Cash payments are non-distributable in this case, as the District Court correctly found, because class members cannot self-identify, and any attempt to identify more than a miniscule portion of the class (beyond the very few with access to their old network hardware) would be prohibitively expensive. As the District Court explained:

> [T]he Court observed firsthand [] the painstaking, three-year process that the Special Master undertook just as to eighteen named plaintiffs. . . . At the motion hearing, the parties shed further light on the question of self-identifying. The problem is that unlike a case in which a class member could self-identify as having bought, for example, a particular brand of cereal during the class period, no member of the class here can know whether Google intercepted his or her data. The only evidence is the intercepted data, and that evidence is not in the class member's possession. While it is in Google's possession, making sense of it requires a lengthy process, akin to the Special Master's process….

ER26-27.

Approximately 60 million out of 330 million Americans, or nearly one in five, meet the class definition, but no class member knows that they do. No claims could be filed in good faith. At best, a process could be established where nationwide publication notice invited all Americans with an unencrypted Wi-Fi network during 2007-2010 to supply the "MAC address" of the wireless routers used. *See* ER24 (hardware "critical to demonstrating that Google actually intercepted their data"); ER78-79. The response rate predictably would be exceedingly low. This is because (a) the overwhelming majority of those who

receive notice almost certainly would not have the network hardware from ten or more years ago, (b) the very few who retained their hardware would have little incentive to supply it on a less than one-in-five chance of being a class member, and (c) likely about 20% of those submitting their MAC address would be class members.

Lowery fails even to acknowledge that verification is part of a standard claims process, undertaken in each of the other cases he proffers as "evidence," and Lowery ignores that validating claims here would involve a painstaking and expensive process that would diminish the settlement fund far below the $0.22 *pro rata* amount calculated on the entire common fund. ER25-26.

Lowery points to other settlements, where claims processes resulted in cash payments from $15 to "over $100," asserting that they are "evidence" a claims process is feasible here. Br. 9, 29-30. But these cases are not evidence at all. In Lowery's cases, unlike in this case, at least one party could readily access information establishing the identity of valid claimants. *Compare Fraley v. Facebook, Inc.*, No. 11-01726, 2012 WL 6013427, at *2 (N.D. Cal. Dec. 3, 2012) (no dispute that claims were readily verified and class members could be contacted via e-mail or Facebook messaging); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330, 2016 WL 4474366, at *3 (N.D. Cal. Aug. 25, 2016), *amended in part*, 2016 WL 6091521 (N.D. Cal. Oct. 19, 2016) (no dispute

that claims were readily verified with reference to mobile device or telephone numbers); *In re Google Plus Profile Litig.*, No. 18-06164 (N.D. Cal. Aug. 12, 2020), Preliminary Approval Order, Dkt. 71, at 6 (no dispute that defendant can readily compile a "class list"). It does not follow from the fact of those settlements that the settlement fund in *this* case, with the unique problems in identifying class members, is distributable.

## 1. Service Awards are Not "Evidence" the Fund is Distributable

The plaintiff service awards do not change the analysis on the settlement fund's non-distributability, because service awards are not compensation for damages under the settlement. Service awards "compensate class representatives for work done on behalf of the class [and] make up for financial or reputational risk undertaken in bringing the action, and, sometimes, [] recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). "[R]elevant factors" for scrutinizing a proposed service award include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, [and] the amount of time and effort the plaintiff expended in pursuing the litigation …." *Roes*, 944 F.3d at 1057. These factors, which do not speak to whether "proof of individual claims would be burdensome or distribution of damages costly," *Lane*, 696 F.3d at 819 (citations omitted), have nothing to do with whether the settlement

fund is distributable. The propriety of service awards in this case does not bear on the feasibility of distributing the settlement relief through a claims process.

### 2. The Plan of Distribution is Fair and Reasonable

Lowery insists that this settlement is categorically unfair because it does not include a claims process. Br. 15, 17-18. Lowery asks the Court to depart from its well-reasoned precedent and hold that, as a matter of law, a settlement must offer cash payments to class members—chosen either by lottery or by a claims process that, even without accounting for the difficulties discussed above, Lowery estimates is likely to have a claims rate of "less than 1%"—rather than providing an indirect benefit to the class as a whole through *cy pres* relief. Br. 29, 32.

The District Court did not abuse its discretion by rejecting Lowery's categorical argument and approving a settlement that is fair, reasonable, and adequate on the facts of this case. In approving *cy pres* distributions, the District Court properly scrutinized "the effectiveness of any proposed method of distributing relief to the class," Fed. R. Civ. Proc. 23(e)(2)(C)(ii), and found that the *cy pres* distribution will be effective.[4] It found that "[e]ven assuming that a

---

[4] The advent of Rule 23(e)(2)(C)(ii) does not change the Circuit standard on non-distributability. The Rule requires district courts to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." It does not require courts to reject a settlement if a settlement fund is non-distributable. The Rules Committee's Note to the 2018 amendments states that "[t]he goal of this amendment is not to displace any factor" used by courts in evaluating class settlements, "but rather to focus the court and the

self-identifying claims process would work, … it is not necessarily desirable,"
because "[a] settlement that benefits 1% of the class, and that has no benefit to
99% of the class, is not so obviously superior to a *cy pres*-only settlement that the
Court must reject this settlement as unfair." ER27. No controlling authority
supports—much less requires—mandating small payments to a tiny fraction of
class members over payments to fund research, analysis, education, and advocacy
on Internet privacy issues that will benefit a much greater proportion of the class.

Contrary to the implications in Lowery's brief, the trial court in *Fraley* did
not endorse Lowery's policy rationale favoring a claims process. The court
declined preliminary approval of a *cy pres* settlement based on factors specific to
that case. *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943 (N.D. Cal. 2013),
*aff'd* 638 F. App'x 594 (9th Cir. 2016). Indeed, according to the district court, it
"did not state or imply that a cash payout to the class would be an absolute
prerequisite to finding a settlement fair, reasonable, and adequate." *Id.* Here, for
reasons specific to this litigation, *cy pres* is a reasonable—indeed, better—means
of distributing the settlement funds.

---

lawyers on the core concerns of procedure and substance that should guide the
decision." The amendments merely formalize the close attention to problems of
distributability already required by this Circuit and amply paid by the district court.
*See* ER24-29.

Lowery is also wrong to assert a conflict with *Molski*, 318 F.3d 937. Br. 34. This is not a case like *Molski* where "'there is no evidence that proof of individual claims would be burdensome or that distribution of damages would be costly.'" 318 F.3d at 955. On the contrary, there are fully supported factual findings to that effect. ER24-29. Moreover, what this Court noted in *Lane* applies equally here: "Unlike the $195,000 *cy pres* fund in *Molski*, the settlement in this case provides for a substantial" *cy pres* "payout . . . for the benefit of the class and thus does not present a situation in which class representatives and counsel accepted their respective fees as a quid pro quo for quietly going away while the class receives virtually nothing." 696 F.3d at 824-25. Both of these are "features [that] distinguish the present case from *Molski* and help to account for why the latter was one of the 'rare' cases where [this Court] ha[s] intruded into the discretion of the district court by setting aside its determination that a settlement agreement is fundamentally fair." *Id.* at 825.

**B.    Even if a Claims Process were Possible, the Settlement Fund Could Provide Only *De Minimis* Payments to Each Class Member**

Even if, counter-factually, a claims process could be conducted at no cost whatsoever, and class counsel recovered no fees or expenses, the per-class member payment would be approximately $0.22. ER25. The fund would be non-distributable anyway. In *Google Referrer*, this Court recently considered a similar case in which Lowery's counsel argued that a district court's finding of non-

distributability was in error. 869 F.3d at 741-42. The Court "quickly dispose[d]" of his argument, measuring non-distributability primarily by the *de minimis* amount of each class member's share of the settlement fund:

> The district court's finding that the settlement fund was non-distributable accords with our precedent. In *Lane*, we deemed direct monetary payments "infeasible" where each class member's individual recovery would have been "*de minimis*" because the remaining settlement fund was approximately $6.5 million and there were over 3.6 million class members. The gap between the fund and a miniscule award is even more dramatic here. The remaining settlement fund was approximately $5.3 million, but there were an estimated 129 million class members, so each class member was entitled to a paltry 4 cents in recovery—a *de minimis* amount if ever there was one.

*Id.* at 742.

On this basis, the Court affirmed the district court's finding and rejected the objectors' arguments. *Id.* At $0.22 before fees or expenses in this case, the individual class members' entitlements fall squarely between the two amounts affirmed in *Lane* and *Google Referrer*. ER25-26; *see also In re Netflix Privacy Litig.,* No. 11-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013), at *1,*7 (finding that a $9 million settlement would provide only *de minimis* payments to a class of 62 million). The Court could affirm on this basis alone, even absent the substantial difficulty and expense of identifying class members—it is obviously not economically viable to deliver payments to a substantial portion of the class.

The uncontroverted facts of this case, and this settlement, confirm that the District Court neither strayed from controlling precedent nor abused its discretion

in finding the *cy pres* settlement to be fair and reasonable. This case, with 60 million class members and a $13 million common fund, where class members cannot self-identify, the parties themselves cannot identify class members, and only through an unusually difficult and expensive process could some class members be identified, is the paradigmatic example of a fair and reasonable but non-distributable settlement. Lowery's arguments to the contrary ignore the facts of the case.

### III. A Bright-Line Rule That *Cy Pres* Settlements Are *Never* Appropriate When *Some* Class Members Can Receive a Distribution Is Not the Law, Nor Should It Be

Lowery avoids grappling with the record by suggesting the dispute is about matters of law. He argues that "[i]t must be legal error for courts to permit *cy pres* when it is feasible to distribute money to *some* class members." Br. 18 (emphasis added). Just two years ago this Court rejected that very proposition, and Lowery's counsel can reprise the argument here only because that decision was vacated *on other grounds. Google Referrer*, 869 F.3d at 741-42. In spite of Lowery's mischaracterizations, it is also not the law in any other Circuit. Nor should it be.

This and every Circuit to have considered the question recognize that *cy pres* settlements *may* be appropriate where a settlement fund is "non-distributable," *even where **some** class members might plausibly be identified and paid*. This is so for two related reasons: (1) when a settlement fund is non-distributable, *cy pres* is

the only way to deliver benefits to class members who would not file claims (often 99% of the class); and (2) the Court's and class counsel's duty is to ensure the settlement is fair and reasonable for the class *as a whole*, rather than for "some" class members who might file claims. District courts appropriately have discretion to approve settlements that deliver real benefit to the class through *cy pres* funding where a claims process would only benefit a small portion of the class.

Lowery would abandon these potential benefits in order to prevent abuse of the *cy pres* mechanism. But the solution to potential abuse is not to ban *cy pres* altogether. Rather, to safeguard against that possibility, this Court already requires district courts to carefully consider the nature of the class, the proposed settlement mechanics, possible alternative plans of distribution, and the potential benefits to the class of *cy pres* awards and direct payments to class members. These are classic questions of discretion for district courts, because those courts are closest to the facts and most able to identify fair and reasonable results for class members. Adopting Lowery's bright-line rule would, in at least some cases, prevent district courts from approving the best result for the class.

### A. Other Circuits Also Permit *Cy Pres* Settlements When Funds Are Non-Distributable

Lowery argues that the Court must accept his novel bright-line rule or "create a circuit split with the Third, Fifth, Seventh, and Eighth Circuits." Br. 34. In fact, the law in each of those courts is consistent with the Ninth Circuit, and

none has adopted the rule Lowery advocates. The law concerning *cy pres* distributions is remarkably uniform across the country: courts should prefer direct payments over *cy pres* funding "[w]here it is still logistically feasible and economically viable" to do so. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *accord In re: Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 327 (3d Cir. 2019); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014); *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *see also* Principles of the Law of Aggregate Litig. § 3.07 (Am. L. Inst. 2010) (widely cited with approval in the above cases, noting that courts may resort to *cy pres* where "the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair"). This standard is widely understood to be the same as the Ninth Circuit standard. *See Holtzman*, 728 F.3d at 689 (citing *Six Mexican Workers*, 904 F.2d 1301 and *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) as support for feasibility standard); *Baby Prods.*, 708 F.3d at 172 (citing *Lane*, 696

F.3d at 819-20); *Masters*, 473 F.3d at 436 (citing *Six Mexican Workers*, 904 F.2d at 1305).

None of Lowery's cases supports his argument that "[f]easibility is determined by the ability of *some* class members to make a claim." Br. 30. Indeed, authorities that are not silent on the issue make it clear that a settlement must be evaluated based on how it benefits the class as a whole. This approach is inconsistent with Lowery's proposal that a distribution to a tiny sliver of the class is always reasonable, and a *cy pres* distribution is always unreasonable. *See Baby Prods.*, 708 F.3d at 174 ("The Court must determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class *as a whole*.") (emphasis added); *Klier*, 658 F.3d at 477 ("[T]he district court must act for the benefit of the class *as a whole*.") (emphasis added); *see also Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 84 F.3d 451, 456-57 (D.C. Cir. 1996) (in deciding among fluid recovery options, directing courts to consider "the proportion of the class members sharing in the recovery"). At least two Circuits have approved settlements in which it was clear that "some" class members could have been identified and paid, but that broad distributions were not feasible. *See In re Lupron Mktg. and Sales Practices Litig.*, 677 F.3d 21, 31-33 (1st Cir. 2012) (approving *cy pres* in preference to

distributions to prior claimants); *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706-07 (8th Cir. 1997) (approving *cy pres* where a *pro rata* distribution to prior claimants would be "difficult" because "many class members have probably relocated"); *see also Google Cookie*, 934 F.3d at 327-29 (in Rule 23(b)(2) class, approving *cy pres* only settlement in principle even where payments are possible, but remanding on other grounds).

Most of the cases Lowery cites do not turn on the question whether the district court abused its discretion in finding that a settlement fund was non-distributable. *Klier*, for instance, concerned the district court's interpretation of the settlement agreement, 658 F.3d at 474-75; the central question was whether, having determined that distributions to one *subclass* were infeasible, the court should require distribution to members of the other subclasses. *Id.* at 472-73. *Holtzman* and *Baby Products* vacated approvals on grounds that the district courts had approved settlements insufficient information to determine whether they were fair and reasonable, because claims rates and mechanics bore on that decision. *Holtzman*, 728 F.3d at 688-90; *Baby Prods.*, 708 F.3d at 175-76. The primary holding of *Pearson* is that the district court miscalculated the dollar value of the settlement fund to the class, 772 F.3d at 780-81, and its holding with respect to *cy pres* was that infeasibility had not been demonstrated as required, because the district court had not considered the feasibility of direct distribution as an

alternative. *Id.* at 784. That is not the case here, where the district court not only found that direct distribution was infeasible but specifically considered and rejected the inadequate distribution plans suggested by Lowery. ER24-29.

Indeed, only one of Lowery's cases, *BankAmerica*, reversed a district court's finding that cash payments were infeasible. In that case, the district court had already approved cash distributions to claimants; the claims administrator already had lists of class members who cashed prior checks, and the cost of distributing to those class members was minimal. 775 F.3d at 1064. In those circumstances, the Eighth Circuit held that the district court should require further distributions to claimants rather than *cy pres* funding. *Id.* The case does not support Lowery's argument that the feasibility of distributions should be determined by whether there is enough money to pay some, rather than all, class members. Distributability is a fact-specific inquiry that will be answered differently for different settlements. Each of the facts weighing in favor of feasibility in *BankAmerica* is absent here.

## B. The Court Should Reject Lowery's New Bright-Line Rule Effectively Prohibiting *Cy Pres*

Lowery's proposal to eliminate district courts' discretion to approve *cy pres* settlements is unsupported by precedent. It is also a bad idea, for two main reasons. *First*, *cy pres* settlements can be better at delivering benefits to the class as a whole than settlements that distribute funds to "a miniscule portion of the class," which provide *no* value to the overwhelming majority of the class. *Google Referrer*, 869

F.3d at 742. By funding charitable efforts tailored to benefit class members, *cy pres* can deliver benefit to class members more effectively and equitably than direct payments to the few. Prohibiting *cy pres* solely because payments to "some" class members may be possible would remove an important tool for reaching absent class members with such benefits.

*Second*, the proposal subverts the fiduciary duties of counsel and the courts to the class *as a whole*. Because *cy pres*, in some cases, is more effective at delivering benefit to absent class members, Lowery's rule requires that, at least sometimes, counsel and the courts must forego the best and most equitable approach and arbitrarily prefer the interests of a small portion of the class who could receive payments. Indeed, Lowery concedes that the settlement fund is the property of class members, but inconsistently suggests that the district court should be required to deliver to a few claimants property that belongs to other class members, rather than seeking the best way of delivering benefit to as many class members as possible. Br. 25-26.

Lowery offers no persuasive legal or policy arguments to counter these points. Instead, he relies on nine pages of vague invective against the abuses to which class actions in general and *cy pres* in particular are sometimes subject. Br. 19-28. Some of these abuses are real, others are exaggerated. They are irrelevant to the case at hand—Lowery cannot and does not suggest that *this* settlement is

collusive or otherwise suspect. As justification for banning *cy pres* outright, Lowery's invective falls short.

Lowery's baby/bathwater approach is unnecessary. The proper solution is the one courts have been pursuing for a generation: identifying sources of potential abuse, requiring district courts to scrutinize settlements for them, and reversing abuses of discretion. This approach is not as simple as the blanket rule Lowery proposes, but it allows courts to approve fair and reasonable *cy pres* settlements.

### 1. *Cy Pres* Funding Can Deliver Real Benefits to the Class as a Whole When Direct Payments Cannot

Lowery mistakenly suggests the goal of *cy pres* funding is to benefit "worthy charities" rather than class members. Br. 30 (quotations omitted). In fact, a *cy pres* distribution with the appropriate nexus to the class replicates "as near as possible" the benefits that would be distributed to the class in the absence of the obstacles that make the settlement fund non-distributable. *Nachshin*, 663 F.3d at 1038. The device allows the court to "put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." *Id.* (quoting *Masters*, 473 F.3d at 436).

Charities do not light contributions on fire; they use them to fund work. If a district court has properly "tethered" *cy pres* recipients "to the nature of the lawsuit and the interests of the silent class members," as the Court here has done, the work of recipients will be targeted at populations that consist largely of class members.

*Id.* at 1039. Such work can *compensate* class members who could not be reached with a claims process. *See Lane*, 696 F.3d at 819; *accord* William B. Rubenstein, *4 Newberg on Class Actions* § 12:32 (5th ed. 2019 update) ("*Newberg*"). The District Court found that the *cy pres* awards here would in fact "likely yield actual improvements to internet privacy," which would benefit class members. ER28. Under a claims process, it is undisputed that no compensation flows to class members who do not submit claims. ER27.

*Cy pres* can also better serve deterrent goals than direct payments, funding groups that will prevent and police future abuses. "A foundation that receives $10,000 can use the money to do something to minimize violations of the [statute]; as a practical matter, class members each given $3.57 cannot." *Hughes v. Kore of Indiana Enter.*, 731 F.3d 672, 676 (7th Cir. 2013).[5]

It is true that, when a settlement fund is distributable, a direct payment to a class member is categorically better than an indirect benefit through *cy pres*. That is why *cy pres* is *only* available when the settlement fund is non-distributable. Courts do not approve *cy pres* when non-*de minimis* payments can be made broadly to the class. But when direct distributions are not possible, *cy pres* is sometimes the best way to compensate the class and deter future abuses. This

---

[5] This is especially pertinent where, as here, class members' privacy interests, not their pecuniary interests, were harmed. A small cash distribution does little to redress a non-economic harm to privacy, while *cy pres* funds will protect class members' privacy rights going forward.

settlement is a clear demonstration of the ability of *cy pres* to protect and vindicate the very rights, and to correct the very conduct, at issue in this litigation, far more effectively than could the dysfunctional claims process advocated by Lowery.

### 2. Lowery's Proposal Is Inequitable to Class Members Who Cannot File Claims

Class counsel "must fairly and adequately represent the interest of *the class*." Fed. R. Civ. P. 23(g)(4) (emphasis added). "Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it." *Id.*, Advisory Comm. Note Paragraph 1(B). Counsel have a fiduciary duty to the class "as a whole." *Rodriguez*, 563 F.3d at 968. Thus, class counsel may not arbitrarily prioritize the interests of any particular class member or subset of class members. District courts have a similar "fiduciary duty to look after the interests of absent class members" in approving class settlements. *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

Class Counsel concluded that *cy pres* was, in this case, the only equitable way to distribute benefit to the class as a whole. As Lowery concedes, if a claims process could work, cash payments would be expected to reach only a small portion of the class—likely no more than 1%. Br. 11, 29, 32. Lowery suggests no reason why class counsel or the District Court should advance the interests of those 1% over the interests of the remaining 99%, who receive indirect benefit through *cy pres* but nothing under a direct payment scheme. Indeed, he prefers that the 99%

give their share of the settlement to the 1%. Where, as here, a settlement fund is non-distributable, class counsel should have the flexibility to reach the best result *for the class*, not only for those few class members who could be identified and paid directly, and the court should have the flexibility to approve it.

In order to provide more than *de minimis* payments, even a zero-cost direct payment scheme in this case must rely on an exceedingly low claims rate. ER27. If many class members submit claims, the average award would quickly drop below the cost of distributing payment. ER25. As the District Court recognized, such a scheme perverts counsel's usual and salutary incentives to encourage claims and reach as much of the class as possible. ER27; *cf. Roes*, 944 F.3d at 1058 (expressing skepticism of settlement clause because it "creates an incentive for defendants to ensure as low a claims rate as possible."). "That a high claims rate, ordinarily a measure of success, would *diminish* the success of Lowery's plan suggests it is a bad plan." ER27. In contrast, *cy pres* allows counsel to benefit as many class members as effectively as possible.

Lowery's bright-line rule contradicts the very principles he cites in its favor. In *Klier*, the Fifth Circuit noted that "[e]ach class member has a constitutionally recognized property right in the claim or cause of action that the class action resolves. The settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members." 658 F.3d at 474; *see*

Br. 25-26. To the extent this proposition is correct, it must be that each class member has an interest in the settlement fund proportional to the value of their claim. *See Google Referrer*, 869 F.3d at 742 (noting that "each class member was *entitled* to a paltry 4 cents in recovery") (emphasis added). Authorizing payments to *cy pres* beneficiaries who will use the funds to benefit the class as a whole is fair; delivering the value of some class members' shares to *other* class members is far less equitable. *See Keepseagle v. Vilsack*, 307 F.R.D. 233, 248 (D.D.C. 2014) (Claimants "cannot now claim a property right in funds that were intended to pay the claims of other class members who did not claim their award."); William B. Rubenstein, *4 Newberg on Class Actions* § 12:30 (5th ed. 2019 update) ("When a class member does not claim her share of the fund, it is not at all obvious that her share therefore belongs to the other class members."). Indeed, as Professor Rubenstein pointed out in an *amicus* brief in *Frank v. Gaos*, Lowery's preferred approach "is no less a *cy pres* approach—it too takes some of class members' property and gives it to legal strangers." Brief of Prof. William B. Rubenstein as Amicus Curiae (No. 17-961), 2018 WL 4293386, at 4. Lowery suggests no reason why the District Court should have held that only a settlement that distributes silent class members' property interests to claimants is reasonable.

### 3. The Solution to *Cy Pres* Abuse Is Judicial Oversight, Not a Blanket Prohibition on *Cy Pres* Settlements

In support of his bright-line rule, Lowery invokes a panoply of "abuses" and potential conflicts attendant to class practice generally and *cy pres* in particular. Br. 19-28. Some of these are real concerns, though Lowery does not dispute the District Court's findings that neither conflict nor abuse was present here. *See* ER14-15, ER23-24, ER30-31. The solution, however, is not to ban *cy pres* whenever "some" class members can be identified. Rather, this Court should protect class members by doing what it *has been doing* for decades: identifying potential conflicts and abuses, instructing district courts to carefully scrutinize *cy pres* settlements, and reversing abuses of discretion.

That the question of distributability involves some district court discretion does not mean that such discretion is unlimited. This Court has identified several factors relevant to the distributability analysis, including whether "the proof of individual claims would be burdensome or distribution of damages costly," the size of the settlement fund, and the size of the class. *See Google Referrer*, 869 F.3d at 741-42; *Lane*, 696 F.3d at 819-20; *Nachshin*, 663 F.3d at 1036. Each of these questions, in turn, may point to further, case-specific questions.[6] The district court

---

[6] *See, e.g.*, § II.A on identifying claimants, where the factual finding regarding proof of individual claims leads to further factual questions about, *e.g.*, the availability of old hardware and the difficulty and expense of identifying class members in the database of intercepted data.

must review the settlement closely for signs of abuse and ensure a tight nexus between the *cy pres* recipients and the subject-matter of the case. *See Nachshin*, 663 F.3d at 1038-41; *Six Mexican Workers*, 904 F.2d at 1307-09. The district court must identify the correct legal standards and constrain itself to findings of fact that are not clearly erroneous. *Nachshin*, 663 F.3d at 1038. But no single bright-line rule distinguishes all cases where a *cy pres* settlement is approvable from those in which it is not.

The Ninth Circuit has not blindly approved *cy pres* settlements; it has articulated exacting standards such settlements must meet, and vacated several approvals. *See, e.g.*, *Dennis*, 697 F.3d at 865-67; *Nachshin*, 663 F.3d at 1041; *Bluetooth*, 654 F.3d at 947-49; *Six Mexican Workers*, 904 F.2d at 1308. This approach has led courts to scrutinize *cy pres* settlements carefully and demand strong arguments that they serve the class. They led to the carefully reasoned opinion of the District Court in this case, which serves the class and guards against abuse. The Ninth Circuit's present approach, not Lowery's, is the right one.

## IV.    The District Court was Correct to Certify the Class and Appoint Class Counsel

The District Court's class certification order was amply supported by the record. *See Doninger*, 564 F.2d at 1309; ER13-17.

Lowery, echoed by *amici* 13 Attorneys General, challenges certification under Rule 23(a)(4), 23(g)(4) and 23(b)(3) from a single flawed premise: that the

settlement affords no relief to the class.[7] Br. 30-36; Brief of Thirteen Attorneys General as Amici Curiae at 13-16, Dkt. 21. Lowery seeks legal support in Justice Thomas's dissent in *Frank v. Gaos*, which argues that a *cy pres* only settlement is *necessarily* inferior to individual actions. *See* 139 S. Ct. 1041, 1046-48 (2019) (Thomas, J., dissenting). But that argument, too, was premised on the proposition that the settlement "extinguish[ed] the absent class members' claims without providing them any relief." *Id.* From that erroneous foundation, Lowery asserts that a release of class members' claims for "nothing" renders counsel inadequate, and that because class members receive "nothing" from the settlement, individual litigation would be superior to class treatment under Rule 23(b)(3). Lowery also argues, incorrectly, that this Court's opinion in *Briseno*, 844 F.3d 1121 cannot be reconciled with certification of a settlement class where cash payments are non-distributable.

---

[7] The *amici* either settled claims regarding the exact same conduct for less consideration than Plaintiffs have obtained (Alaska, Arizona, Arkansas, Louisiana, Missouri and Ohio), or did not challenge Google's conduct (Alabama, Idaho and Indiana). In 2013, a group of state AGs entered into an Assurance of Voluntary Compliance ("AVC") with Google. Pursuant to the AVC, Google paid $7 million to those states; none of it was distributed to citizens. ER180-81. Even if the injunctive relief in this case were duplicative of the injunctive relief the AGs obtained, which it is not as explained below, the $13 million settlement fund almost doubles the AVC's monetary relief.

## A.    The Class and Class Counsel Satisfy Rule 23

The District Court did not abuse its discretion in finding Rule 23's

prerequisites are met. With regard to Rule 23(a)(4)'s adequacy prong, the District

Court noted Counsel's "vigorous and capable advocacy" over the course of nearly

10 years, and explained that Lowery's contention "assumes, wrongly, that the *cy*

*pres* settlement is not a benefit to the class." ER14 (citing *Lane*, 696 F.3d at 819 (in

*cy pres* remedy, "class members receive an indirect benefit . . . rather than a direct

monetary payment")).

This settlement benefits the class. The Final Approval Order allocates the

settlement relief nationwide, to organizations that will serve as watchdogs for the

entire class and use the funds to protect the privacy rights at issue and further the

goals of the ECPA. Each organization has "a track record of addressing consumer

privacy concerns" and has committed to use the funds to promote the protection of

Internet privacy. ER 31; ER196, ¶¶29-30. The *cy pres* recipients take

complementary approaches to fulfilling ECPA's statutory objectives and furthering

class members' privacy interests.[8] The *cy pres* distribution here also ensures that

---

[8] Detailed proposals from each *cy pres* recipient were before the District Court.
The organizations will use any awarded funds (1) to educate consumers,
empowering them to protect themselves from intrusions into their online affairs
(SER105-121); (2) to promote and contribute to law and policy regimes that
protect consumer privacy (SER36-49; 91-104); and (3) to educate computer
programmers and engineers to incorporate consumer privacy into their design
approaches, preventing future corporate abuses of consumer privacy. (SER50-60).

the deterrence goals of the ECPA are achieved, and the salutary rights conferred by

Rule 23 upon diffuse groups of similarly situated consumers are realized and

preserved.[9] When, as here, the recipients of *cy pres* funding work on policies

benefitting the class broadly, this benefit can reach a much higher portion of the

class than direct payments to a small sliver of the class. *See* ER28 ("the award

would . . . likely yield actual improvements to internet privacy."); *accord Newberg*

§ 12:32. Lowery dismisses these benefits, but cannot show that the District Court's

factual findings were clearly erroneous.

Similarly, in finding that superiority under Rule 23(b)(3) was met, the

District Court conducted the appropriate fact-intensive assessment of the

circumstances of this case, including the prohibitive costs of litigating individual

claims, a significant disparity between litigation costs and what class members

might hope to recover, and the efficiency of aggregate litigation as opposed to

individual cases on each class member's behalf. ER15-17. After extensive

publication notice, only one request for exclusion from the settlement was

submitted, ER32, which belies Lowery's assertion that class members would be

_____

[9] The District Court also correctly found that the settlement's injunctive relief has
value to the class. ER19. Neither Lowery nor the 13 AGs dispute that the relief
negotiated by 39 Attorneys General in 2013 provided a meaningful (albeit partial)
remedy for Google's conduct, nor that the settlement in this case extends Google's
obligations to maintain privacy programs and informational materials for years
after its obligations under the Consent Decree expire. The settlement also brings
Google's continued compliance under the District Court's jurisdiction and requires
Google to report annually to class counsel. ER197; ER203.

"better off" without aggregate representation, or might prefer to litigate individual suits, Br. 41.[10] The District Court's determination regarding superiority was an appropriate exercise of its discretion. *See Doninger*, 564 F.2d at 1309.

In light of this record, Lowery's arguments against class certification find no support in *In re Hotel Telephone Charges*, 500 F.2d 86 (9th Cir. 1974). *Hotel* did not involve a *cy pres* distribution or even a settlement. *See id.* In that case, the Court rejected fluid recovery as a remedy at trial because it would have allowed the plaintiffs to circumvent the individual issues surrounding class members' antitrust claims, thus violating the Rules Enabling Act and the defendants' due process right to raise individual defenses. *Id.* at 89-90. This Court held that a class action was not the superior means of resolving that controversy because the class members' antitrust claims involved a "great variety" of individualized determinations. *Id.* at 90–91; *see also Six Mexican Workers*, 904 F.2d 1301 at 1305–06 (distinguishing *Hotel* on the basis that the case raised concerns regarding "individual proof of damages"). Here, Lowery's question, "What is best" for the absent class members, Br. 38, is precisely the inquiry class counsel and the District Court considered, finding that the difficulty and cost individuals would incur in

---

[10] Lowery is also wrong to insist that Class Counsel violated a duty to advise class members to opt out "en masse." Br. 41. The purported duty is based solely on Lowery's unsupported rhetoric about *cy pres* relief having no value.

demonstrating Google's liability relative to the limited potential recovery rendered a class action superior. ER15-17.

**B.    A *Cy Pres* Distribution Does Not Undermine the Superiority of Aggregate Litigation for This Class**

Three years ago, this Court "easily reject[ed] Objectors' argument that if the settlement fund was non-distributable, then a class action cannot be the superior means of adjudicating this controversy under Rule 23(b)(3)." *Google Referrer*, 869 F.3d at 742. Nevertheless, Lowery's counsel recycles this argument. This time he draws on this Circuit's Rule 23 "feasibility" analysis in *Briseno* to argue that the class can meet either the superiority requirement, or the standards for a *cy pres* settlement, but not both. *See* Br. 9. Lowery's argument conflates "feasibility" for purposes of certifying a class with "distributability" for purposes of distributing a class settlement fund. *Briseno* does not require that it be easy to identify class members to certify a class. *Briseno*, 844 F.3d at 1133 ("Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification."). In cases that yield non-distributable funds, class actions are *more* likely to meet the superiority requirement, because such cases often have small value claims. "[W]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Google Referrer*, 869 F.3d at 742-43; *see also Hughes*, 731 F.3d at 677 ("[W]e don't think smallness should

be a bar. This is obvious when what is small is not the aggregate but the individual claim; indeed that's the type of case in which class action treatment is most needful.").

Moreover, Lowery is wrong to suggest that *Briseno* required the District Court to ignore the evidentiary record and find that direct payments *are* feasible in this case. Br. 35-36. Lowery argues that by finding that class members in this case could not self-identify, the District Court held them to "a higher standard than cooking-oil consumers" who comprised the class in *Briseno*. *Id.* However, the *Briseno* class members could self-identify, and the question there was whether sufficient protections were in place to avoid paying fraudulent claims. 844 F.3d at 1130. Here, as discussed *supra* § II.A, class members simply cannot self-identify.

## V. The District Court was Within its Discretion to Approve the Proposed *Cy Pres* Recipients

The District Court's approval of eight independent non-profit organizations to receive funding from the settlement was properly—and exclusively—based on the record and the benefit to the class. Lowery argues that one of these eight organizations, the ACLU Foundation, has a "significant prior affiliation" with Class Counsel that is improper under comment b to ALI Principle 3.07. According to Lowery, this "affiliation" renders the Court's approval of the entire settlement "legal error." Br. 44-46.

Lowery's argument does not withstand scrutiny. The precise contours of "significant prior affiliation" are not defined by the comment to the ALI Principle on which Lowery relies. *See Google Referrer*, 869 F.3d at 744. But what is clear is that the "affiliation" between counsel and the ACLU Foundation—that counsel's law firms have filed civil rights lawsuits as co-counsel with ACLU and its state affiliates—does not require excluding the ACLU Foundation from the *cy pres* award, let alone reversing settlement approval. The connection is not "significant" in the sense that it "would raise substantial questions about whether the selection of the recipient was made on the merits." ALI Principles § 3.07 cmt. b. Importantly, the "selection of the recipient" was made by the District Court, not class counsel. ER196. The District Court was fully advised of class counsel's work with the ACLU (SER10) and scrutinized the proposed recipients to ensure no conflicts of interest or loyalty could undermine the interests of the class—it found none. ER31.

The District Court's conclusion was sound. The ACLU is one of America's largest, oldest, and best-known civil society organizations, with affiliate organizations in every U.S. State. It is a broad organization, litigating issues ranging from prisoners' rights to LGBT equality. SER95-96. Counsel's work with divisions of this large and diversified organization on other matters does not suggest a conflict with the class here, where the *cy pres* funds will be devoted exclusively to furthering ACLU's critical efforts on data privacy and security, and

the interests of this class.[11] As further evidence that the District Court selected the *cy pres* recipients on their merits, the District Court did not adopt Plaintiffs' proposals in their entirety, but rather included one recipient that had not been proposed and allocated the settlement fund differently from what had been proposed. ER31. The ACLU also readily satisfies the "nexus" requirement in this Circuit. ER30-31; *Lane*, 696 F.3d at 821.

Nor does Google's prior funding of recipient organizations raise any question about the propriety of the *cy pres* awards here. Lowery's baseless accusation that the relief is a "paper tiger" to cover up donations Google was already going to make, Br. 25, 45, is contradicted by the terms of the Settlement, pursuant to which Google—which did not select the recipients to propose to the court or even influence Plaintiffs' proposal—attests that the *cy pres* distributions will be additional to its ordinary charitable giving. ER195; ER197.

---

[11] Lowery's citation to *Knapp v. Art.com, Inc.* does not demonstrate that the District Court here committed "legal error," as he claims, or abused its discretion. The court in *Knapp* found that the proposed *cy pres* recipient was "not an appropriate designee" because it was co-counsel with class counsel in another matter, but provided no further analysis. 283 F. Supp. 3d 823, 835 (N.D. Cal. 2017). Here, the District Court did not find ACLU's involvement in prior litigation with class counsel disqualifying. This was not an abuse of discretion given ACLU's size and diversity and its detailed and effective proposal for use of settlement funds. "The existence of discretion means that one district court could reach a conclusion different from the conclusion of another district court," without abusing its discretion. *Mission Linen Supply v. City of Visalia*, 817 F. App'x 336, 338 (9th Cir. 2020). Moreover, contrary to Lowery's suggestion that settlement approval was "legal error," the *Knapp* court *approved* the settlement, ordering that an alternate *cy pres* designee be nominated. 283 F. Supp. 3d at 835.

## VI.    The Settlement Does No Injury to Lowery's First Amendment Rights

Lowery argues that the Court's award of *cy pres* funds to organizations with which he has some disagreement is a violation of Lowery's free speech rights.[12] Br. 42-43. But no court has *ever* refused to authorize a *cy pres* distribution on First Amendment grounds.[13] Instead, Lowery seeks to analogize the District Court's finding that a settlement among private parties is fair and reasonable to class members, to cases in which state governments were prohibited from conditioning employment on employees' contributions to unions. Lowery's argument that he was compelled to speak also ignores his option to opt out of the settlement.

"The Free Speech Clause of the First Amendment prohibits government— not a private party—from abridging speech." *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020). The District Court approved an agreement between private parties—class members represented by Plaintiffs, and Google—to resolve their legal dispute. "[N]either the district court's approval nor its potential enforcement of these private settlement agreements constitutes state action for the purposes of the First Amendment." *In re: Motor Fuel Temp. Sales Practice Litig.*

---

[12] Lowery does not even offer a factual basis for this argument, as his disagreement is not with any recipient's privacy work, but with their copyright policy. ER147, ¶9. Because *cy pres* funds are expressly limited to work furthering internet privacy, no funds will be used for anything Lowery disagrees with. ER196, ¶30.

[13] Notably, Lowery's argument is not restricted to *cy pres*-only settlements, but applies to all *cy pres* distributions, including awards of remainder funds after distributions to class members.

(*"Motor Fuel"*), 872 F.3d 1094, 1113 (10th Cir. 2017). Judges are charged with overseeing class settlements to ensure that class counsel and the class representatives are not taking advantage of absent class members; these private arrangements are not thereby transmuted into *governmental* settlements.

Judicial enforcement of private arrangements is generally not state action. *See Motor Fuel*, 872 F.3d at 1113-14; *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 207 (3rd Cir. 2012) ("The District Court's enforcement of [a consent decree] against the RNC does not result in a First Amendment violation."); *United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 942-43 (11th Cir. 1995) (holding that judicial enforcement of a settlement agreement is not state action for First Amendment purposes); *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (judicial enforcement of "secrecy agreement" does not violate First Amendment); *see also Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 386 (7th Cir. 2014) (judicial confirmation of an arbitration award is not state action); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1201 (9th Cir. 1998) ("[N]o state action is present in simply enforcing" an arbitration agreement), *overruled on other grounds*, *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Davis v. Prudential Secs., Inc.*, 59 F.3d 1186, 1191-92 (11th Cir. 1995) (same). "That parties be able to enter into enforceable settlement agreements as a means of ending controversies is a good

thing." *United Egg*, 44 F.3d at 943. "If, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated." *Id.* (quoting *Edwards v. Habib*, 397 F.2d 687, 691 (D.C. Cir. 1968)).

There are exceptions. The most notable one is *Shelley v. Kraemer*, in which the Supreme Court held that state court enforcement of racially restrictive covenants constitutes state action. 334 U.S. 1, 14-23 (1948). But "*Shelley*'s holding has never been applied outside the context of race discrimination." *Everett*, 771 F.3d at 386 n.1. *New York Times v. Sullivan*, on which Lowery relies for the proposition that *Motor Fuel* is "wrong," is inapposite.[14] 376 U.S. 254 (1964). It is true that *Sullivan* applied the First Amendment to the application of *substantive* state libel law, but that is not the court's role here. The state action in *Sullivan* was "the application of state rules of law in state courts," not enforcement of agreements between private parties.[15] *Cohen v. Cowles Media Co.*, 501 U.S. 663,

---

[14] Lowery's counsel was counsel for the objectors in the *Motor Fuel* case, so it is telling that he resists its conclusion without clearly articulating why.

[15] Lowery also cites *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-48 (1999) for the proposition that "approvals of class-action settlements [are] state action subject to constitutional limitations." Br. 42. *Ortiz* does not hold that class action approvals are state action; rather, it suggests that Rule 23 must be read in light of due process concerns, which is unremarkable insofar as Rule 23 sets out the process by which class members' rights are vindicated.

668 (1991); *accord Youssofi v. Credit One Fin.*, 717 F. App'x 745, 745-46 (9th Cir. 2018) (non-precedential).

Even if judicial approval of a settlement agreement *were* state action, Lowery's cases provide no support for the proposition that it would violate the First Amendment prohibition on compelled speech. First, as the District Court observed, "class members had the opportunity to exclude themselves from the settlement," so Lowery was not "compelled" to do anything. ER29. Lowery argues that, somehow, the exercise of an opt-out right would not change whether the *cy pres* awards were made "in the class members' name," Br. 43, but that is plainly wrong; opt-outs do not participate in the settlement, so they cannot be said to have any interest in the disposition of settlement funds. *See* William B. Rubenstein, *4 Newberg on Class Actions* § 9:39 (5th ed. 2019 update). He argues that "silence is not consent," but it is fundamental to the class-action mechanism that an opportunity to opt out is adequate process to bind class members. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

Moreover, the compelled funding cases on which Lowery relies are starkly different from settlement approvals. They are cases concerning the extent to which *the government* may compel non-union employees to pay fees to public unions. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018); *Harris v. Quinn*, 573 U.S. 616 (2014); *Knox v. SEIU, Local 1000*, 567 U.S. 298 (2012). In each of these cases

(and every compelled subsidy case), the fee in question was actually compulsory, on pain of unemployment; here, all that was required to opt out was for class members to send a letter so stating to the Notice Administrator. Lowery fails to explain why this process, which satisfies the requirements of the Due Process Clause to bind class members, nonetheless does not avoid any compulsion to participate in unwanted speech.

He also fails to articulate a limit to his theory of "compelled speech." It cannot be true that the state may never compel citizens to "subsidize" speech with which they disagree, or even that such subsidies automatically trigger strict scrutiny. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559 (2005) (First Amendment does not prohibit compelled subsidy of "government speech"); *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 221 (2000) (permitting mandatory university activity fees that support student speech). Lowery's First Amendment theory is unsupported by the law and should be rejected. *See Perkins v. LinkedIn Corp.*, No. 13-04303, 2016 WL 613255, at *11 n.9 (N.D. Cal. Feb. 16, 2016).

## VII. The District Court's Attorneys' Fee Award Was Proper

Attorneys' fee awards are reviewed for abuse of discretion. *Bluetooth*, 654 F.3d at 940. Lowery argues that the District Court abused its discretion in awarding the "benchmark" 25% of the net common fund as attorneys' fees, which represents

a negative 0.55 multiplier on Class Counsel's lodestar as of October 2019. Br. 46-48; ER5; SER2-3. The sole basis for Lowery's objection to the attorneys' fee award is that the settlement fund was non-distributable via cash payments and will be distributed via *cy pres*. Br. 46-48. Lowery's argument simply rehashes his erroneous assertion that *cy pres* distributions do not benefit the class, in yet another guise.

This Court has never held that the value of a common fund depends on the form that distributions ultimately take. On the contrary, it has consistently affirmed attorneys' fee awards that represent a reasonable percentage of the common fund, where reasonableness is evaluated in light of the risk posed by the action and the time and skill required to secure a successful result for the class, even when the circumstances of a particular case warrant distributing that fund by *cy pres*.[16] *See Google Referrer*, 869 F.3d at 747 (district court did not abuse its discretion by approving 25% of common fund in a *cy-pres* settlement, holding "there is no support for Objectors' view that the settlement should have been valued at a lower amount for the purposes of calculating attorneys' fees simply because it was *cy-pres*-only."); *Lane*, 696 F.3d at 823-824 (affirming award calculated using the lodestar method that was approximately 1/3 of common *cy pres* fund).

---

[16] This Circuit recently re-affirmed a District Court's discretion in valuing the relief obtained by a class for purposes of determining attorney fees. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1126-1127 (9th Cir. 2020).

Here, the District Court properly used its discretion to find that the settlement, which contains both injunctive and *cy pres* relief, benefits the class and that class counsel's representation warrants an award of attorneys' fees equal to the benchmark. *See* ER16 ("[T]he Court does not agree that this settlement is only a vehicle for extinguishing class claims. This settlement has yielded some amount of injunctive relief as well as a meaningful settlement fund that can benefit the class by serving the class's interest in protecting internet privacy."); ER14-15 (finding that Lowery's argument "assumes, wrongly, that *cy pres* settlement is not a benefit to the class" and "it assumes, wrongly, that the attorneys' fees in this case are some kind of windfall for Class Counsel, who are seeking a negative loadstar multiplier after spending nearly a decade on this case."). Lowery's argument is devoid of any valid reason why the District Court abused its discretion.[17]

Lowery's argument that court-approval of this settlement is bad public policy because it will open the flood gates to *cy pres* settlements that leave class

---

[17] The non-binding case law cited by Lowery does not support his assertion that the District Court abused its discretion. Courts in other Circuits are not required to reduce the value of a *cy pres* fund for the purpose of calculating attorneys' fees. Rather, consistent with this Circuit's law, it is a matter of discretion. *See Baby Prods.*, 708 F.3d at 178-79 ("We think it unwise to impose … a rule requiring district courts to discount attorneys' fees when a portion of an award will be distributed *cy pres* ... our approach is case by case, providing courts discretion to determine whether to decrease attorneys' fees where a portion of a fund will be distributed *cy pres*."); *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012); *Pearson*, 772 F.3d 778.

members "out in the cold" lacks merit. Br. 47. Not only does Lowery present no evidence that *this* settlement disproportionately benefits counsel, who to date, have provided "vigorous and capable advocacy" to the class over more than ten years, ER14, Lowery ignores the fact that all settlements, including *cy pres* settlements, must be approved by the district court as fair, reasonable and adequate, as this one was, ensuring that purported improper motives by defense and/or class counsel do not result in unfair outcomes for the class. Indeed, the District Court specifically recognized this exact argument and rejected it. ER19 n.6 ("That has not meant that every class action settlement has resulted in a *cy-pres* only settlement. This Court would not find a *cy pres*-only settlement fair, reasonable, and adequate in many circumstances. But where the settlement fund is non-distributable, counsel should not be penalized for fashioning a *cy pres*-only settlement that stands to accomplish some good.").

## CONCLUSION

For the reasons stated above, the Court should affirm the District Court's judgment.

Dated: October 13, 2020

Respectfully submitted,

 /s/ *Daniel A. Small*

Daniel A. Small
Robert W. Cobbs
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
rcobbs@cohenmilstein.com

Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
jkodroff@srkattorneys.com
jmacoretta@srkattorneys.com

Elizabeth J. Cabraser
Michael W. Sobol
Melissa Gardner
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com
msobol@lchb.com
mgardner@lchb.com

# CERTIFICATE OF COMPLIANCE

I am counsel for Plaintiff-Appellees. Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 Times New Roman 14-point font.

Dated: October 13, 2020 /s/ *Michael W. Sobol*
Michael W. Sobol

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the

Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by

using the appellate CM/ECF system on October 13, 2020. Participants in the case

who are registered CM/ECF users will be served by the appellate CM/ECF system.


Dated: October 13, 2020                    /s/ *Michael W. Sobol*
                                           Michael W. Sobol

# **ADDENDUM**

All applicable Rules are contained in the brief or addendum of Objector-Appellant David Lowery.

Dated: October 13, 2020                    /s/ *Michael W. Sobol*
                                           Michael W. Sobol

2043980.17